# EXHIBIT 2

**SHIPBUILDING CONTRACT FOR THE CONSTRUCTION AND SALE**

**BETWEEN**

**YANTAI RAFFLES SHIPYARD LIMITED**
**(AS "BUILDER")**

**BAERFIELD DRILLING LLC**
**(AS "BUYER")**

**For One (1) Unit F&G MILLENIUMSA TWIN LOWER HULLS/4 COLUMNS DPS-2**
**Semi Submersible Drilling Unit**
**("VESSEL")**

**DATED**

**12th JULY 2006**

**BUILDER'S HULL NO: YRO-2006-193**

## CONTENTS:

PREAMBLE ....................................................................................................... 3
ARTICLE I - DEFINITIONS ................................................................................. 4
ARTICLE II - THE VESSEL, DESCRIPTION AND CLASS ................................. 8
ARTICLE III - PRICE AND PAYMENT TERMS .............................................. 11
ARTICLE IV - ADJUSTMENT OF CONTRACT PRICE FOR DELAY -
CANCELLATION BY THE BUYER ..................................................................... 14
ARTICLE V - APPROVAL OF PLANS AND DRAWINGS AND
INSPECTION DURING CONSTRUCTION ........................................................ 15
ARTICLE VI - MODIFICATIONS AND CHANGES ........................................... 20
ARTICLE VII - TEST AND TRIALS .................................................................... 24
ARTICLE VIII – CONTRACT DELIVERY Time and Place .............................. 27
ARTICLE IX - DELAYS AND EXTENSION OF TIME FOR DELIVERY
(FORCE MAJEURE) .......................................................................................... 30
ARTICLE X - WARRANTY OF QUALITY ......................................................... 32
ARTICLE XI - RISK AND INSURANCE ............................................................. 35
ARTICLE XII - DEFAULT PROVISIONS ............................................................ 37
ARTICLE XIII - ASSIGNMENT .......................................................................... 40
ARTICLE XIV - TAXES AND DUTIES ............................................................... 40
ARTICLE XV  INTELLECTUAL PROPERTY, PATENTS, TRADEMARKS,
COPYRIGHTS .................................................................................................... 40
ARTICLE XVI - OWNER FURNISHED EQUIPMENT ....................................... 41
ARTICLE XVII - NOTICES ................................................................................. 42
ARTICLE XVIII - CANCELLATION .....................................................................
ARTICLE XIX - ENTIRE AGREEMENT ............................................................. 43
ARTICLE XX - GOVERNING LAW, DISPUTE AND ARBITRATION ............... 44

## EXHIBITS

EXHIBITS :

| | |
|---|---|
| Exhibit A | Specifications and General Arrangement Drawing |
| Exhibit B | Demarcation List |
| Exhibit C | List of plans and drawings |
| Exhibit D | Instalment Payment Schedule |
| Exhibit E | Construction Schedule |
| Exhibit F | Makers List |
| Exhibit G | Owner Furnished Equipment List |
| Exhibit H | Yard Standard Rates |
| Exhibit I | Form of Protocol of Delivery and Acceptance |
| Exhibit J | Performance Bond |
| Exhibit K | Parts of Millenium S.A. Specification F&G No. 7152-S, of April 16, 1999 |

## PREAMBLE

THIS CONTRACT is made this 12th day of July 2006
by and between:

### YANTAI RAFFLES SHIPYARD LTD

a company organised and existing under the laws of Singapore, having its principal office at No. 1 Claymore Drive, #08-04 Orchard Towers, Singapore 229594 (hereinafter "BUILDER")

### AND

### BAERFIELD DRILLING LLC

a company with registered office in the State of Delaware, United States of America at Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801 (hereinafter called the "BUYER").

## WHEREAS

In consideration of the mutual covenants herein contained, the BUILDER agrees to construct, launch, complete, test, commission, sell and deliver to the BUYER at a location near the BUILDER's shipyard the "VESSEL" as hereinafter described; and the BUYER agrees to purchase the "VESSEL", take delivery and pay for it; all in accordance with the terms hereinafter set forth.

## ARTICLE I - DEFINITIONS

In this CONTRACT the following words shall have the meaning set out hereinbelow:

| | |
|---|---|
| **"Assistants"** | the Buyer's Representative's assistants. |
| **"Bank"** | the name of the Bank referred to in Article III clause 6. |
| **"Banking Days"** | days where banks are open for business in Singapore. |
| **"BUILDER"** | the company referred to as "BUILDER" in the preamble, inclusive of its servants and employees. |
| **"BUILDER's Board"** | the Board of Directors of the BUILDER. |
| **"BUYER"** | the company referred to as "BUYER" in the preamble, inclusive of its servants and employees. |
| **"BUYER's Representative"** | a person authorised in writing by the BUYER as set forth in Article V clause 2. |
| **"Owner Furnished Equipment"** | any item, equipment, stores or services supplied by the BUYER to the BUILDER, including those listed in Exhibit G and including the Drilling Package. |
| **"Change Order"** | the modification of Specifications form as set forth in Article VI clause 1. |
| **"Classification Society" or "Class"** | the Classification Society referred to in Article II clause 3. |
| **"Contract"** | this shipbuilding contract with its Appendices and Exhibits including Specifications and Drawings, and any amendments thereto. |
| **"Contract Delivery Date"** | the date set out in Article VIII clause 1. |
| **"Contract Price"** | the Contract Price as stipulated in Article III clause 1. |
| **"Date of Contract"** | the date specified in the preamble to this Contract. |
| **"Delivery and Acceptance"** | the physical delivery of the VESSEL by the BUILDER and acceptance by the BUYER in accordance with Article VIII. |
| **"Delivery Date"** | Contract Delivery Date, as adjusted for Permissible Delay, Force Majeure Event and change orders. |
| **"Demarcation List"** | the matrix allocating responsibility between the Parties and their subcontractors, as set out in Exhibit B. |
| **"Disputed Modifications"** | a modification which the Parties cannot agree on, to be determined in accordance with Article VI clause 5. |

| | |
|---|---|
| "Drawings" | the plans and drawings listed in Exhibit C hereto. |
| "Drilling Package" | as included in Exhibit G |
| "Effective Date" | the date as mutually agreed by the BUILDER and BUYER in Article III clause 4 |
| "Flag State" | the State referred to in Article II clause 7. |
| "Force Majeure Event" | any one or more of the events set out in Article IX clause 1, and which constitutes Permissible Delay. |
| "Guarantee Engineer" | the engineer appointed in accordance with Article X clause 5. |
| "Guarantee Period" | a period of twelve (12) months from the Delivery and Acceptance of the VESSEL, or such other period as may be mutually agreed between the BUYER and the BUILDER. |
| "Friede & Goldman Marketing" | Friede & Goldman Marketing B.V., a Dutch company with registered address at Haaksbergweg 31 Suite 3, 1101BP Amsterdam Zuidoost, Netherlands, referred to herein as 'FGM' and contracted by BUILDER as a result of this Contract to supply the Drawings and the Marine Systems Design. |
| "Inspections and Test Plan" or "ITP" | the plan setting out the schedule of inspections and tests to be performed on the VESSEL. |
| "Instalment" | the payment milestones listed in Exhibit D. |
| "Maker's List" | the list of suppliers approved for delivery of equipment, machinery or services, as listed in Exhibit F, which shall be included in the Specifications. |
| "Marine Systems Design" | the design and engineering produced by FGM relating to all aspects of design relating to the structure of the VESSEL, its ability to incorporate the Owner Furnished Equipment, its ability to move and moor as described in more detail in the Demarcation List and the Specifications, but in all event exclude all Owner Furnished Equipment, the Drilling Package and drilling-related systems, and sub-sea systems as described in the Specification. |
| "Drilling Systems Design" | all design and engineering related to the Owner Furnished Equipment, the Drilling Package, drilling-related systems and sub-sea systems as described in the Specification. |
| "Modifications" | a modification or change to the Specifications requested by the BUYER pursuant to Article VI clause 1. |

| | |
|---|---|
| "Party" | means either BUYER or BUILDER as the context requires and the term "Parties" refers to both of them collectively. |
| "Permissible Delay" | all delays, inclusive of delays caused by Force Majeure Events, which according to the terms of the Contract permit adjustment of the Contract Delivery Date. |
| "Construction Schedule" | the plan setting out the schedule of Work and deliveries as described in Exhibit E. |
| "Regulatory Bodies" | the relevant authorities, whether governmental or otherwise, imposing rules and regulations with which the construction and delivery of the VESSEL must comply, which shall include without limitation the authorities of the Flag State together with other authorities set out in the Specifications. |
| "Specifications" | the specifications set out in Exhibit A hereto, as drawn up by FGM and from which the Marine Systems Design is developed. |
| "Statutory Modification" | has the meaning attributed to it in Article VI clause 6. |
| "Subcontractor" | any person or company, with whom the BUILDER has entered into a contract for the performance of any aspect of the Work. |
| "Technical Arbitrator" | has the meaning assigned to it in Section XX. |
| "Technical Dispute" | means any dispute among the Parties hereto arising under or in connection with this Contract that is of a technical nature, including, without limitation, in respect of the Design, engineering, construction, engineering documents, construction, procurement, and/or testing, as applicable, of the VESSEL, the quality of materials, the understanding and interpretation of the Specifications, the scope or quality of the Works, modifications, whether the Works fulfil the requirements of this Contract, whether a particular cause of delay is the responsibility of the BUILDER or the BUYER or any third Party, the existence of a Defect, or whether a particular dispute is a Technical Dispute. |
| "Variation" | a request by the BUILDER pursuant to Article VI clause 1(vi). |
| "VESSEL" | the vessel described in Article II (inclusive of all drilling and pipe handling equipment and any and all appurtenances). |
| "Warranty" | the warranty provided by the BUILDER as described in Article X in respect of defective material and/or poor workmanship on the part of the BUILDER, its servants, employees or Subcontractor. |



"Work"

all the activities required to be carried out by the BUILDER to design, construct, equip, test, commission and deliver the VESSEL in accordance with the terms of this Contract.

"Working Day"

a day when work is normally performed in the country of the BUILDER's yard as referred to in Article II clause 1.

"Yard"

the shipyard described in Article II clause 1.

## ARTICLE II - THE VESSEL, DESCRIPTION AND CLASS

1.    **Description and Standard**

(i)    The VESSEL shall be built at the BUILDER's yard located at No.70, Zhifu East Road, Zhifu Island, Yantai 264000, Shandong Province, People's Republic of China and shall have the BUILDER's Hull No.YRO-2006-193 and be constructed, equipped, tested and commissioned, completed and delivered by the BUILDER in accordance with the provisions of this Contract.

(ii)    In the event of inconsistency between the Contract, the Specifications and/or the Drawings and/or the Demarcation List (together, the "Agreement"), such inconsistencies will be resolved by applying the following order of precedence:

(a) the Contract;
(b) the Specification
(c) the Drawings (in case of inconsistency between any of the Drawings, the later in date shall prevail)
(d) the Demarcation List;

(iii)    The VESSEL shall be built, equipped, launched, tested and delivered in accordance with the Specifications, and
   a.    Classification Society rules and regulations currently in force at time of signing of this Contract and the applicable statutory bodies' rules and regulations;
   b    China Shipbuilding Quality Standards ("CSQS"); and
   c    BUILDER'S standard shipbuilding practices, ITP and ISO standards.

2.    **Main Dimensions and Characteristics**

*Approx Dimensions:*

| | | |
|---|---|---|
| Length, overall | : | 315 ft (96.10 m) |
| Breadth, overall | : | 252 ft (76.81 m) |
| Height (from Keel to Main Deck) | : | 138 ft (42.1 m) |

The above measures are indicative only and are subject to the Specifications.

3.    **Classification, Rules and Regulations**

(i)    The VESSEL, including its machinery, equipment, appurtenances and outfittings shall be constructed in accordance with the rules (the edition and amendments thereto being in force as of the date of this Contract) and regulations of American Bureau of Shipping (the "Class"), with the Class notations as detailed in the Specification.

(ii)    The VESSEL shall further comply with the applicable rules, regulations and requirements of the Regulatory Bodies as described in the Specifications in effect as of the date of this Contract.

(iii)    Decisions of the Classification Society as to compliance or non-compliance with classification shall be final and binding upon both parties thereto.

(iv)    All such rules, regulations and requirements shall be complied with, without conditions, reservations or recommendations.



(v)     All fees and charges incidental to and in respect of compliance with Class and the rules, regulation and requirements of the Classification Society (including any substitute as above) or Regulatory Bodies referred to above shall be for the account of the BUILDER.

(vi)    BUILDER shall ensure that all fees for Class review and approval for the Marine Systems Design and Drawings shall be borne by FGM. In the event that FGM does not pay all fees for Class review and approval for the Marine Systems Design and Drawings, BUILDER shall bear such costs.

(vii)   Copies of all correspondence to and from the Classification Society and the Regulatory Authorities referred to in the Specifications and all plans approved by the Classification Society, shall be furnished to the BUYER by the BUILDER within ten (10) Working Days upon request, save always that such information is within BUILDER's control and save that such documents are of a non-confidential and technical nature.

**4.      Subcontracting**

(i)     The hull and major sections thereof are to be assembled by the BUILDER at the Yard set out in Article II clause 1. BUILDER shall have the option and at its responsibility to subcontract part of the hull with other Subcontractors outside BUILDER's Yard with BUYER's consent, such consent not to be unreasonably withheld. Save as aforesaid, the BUILDER may, at its responsibility, subcontract any portion of the construction of the VESSEL.

(ii)    Except as otherwise stipulated in the Specifications and the "Maker's List", the BUILDER may engage any Subcontractor to carry out any aspect of the Work, subject to receiving the BUYER's prior approval of such Subcontractor as per paragraph (i) above. The BUILDER shall in ample time notify the BUYER in writing before placing major orders for equipment or services with any Subcontractor, and shall give reasonable consideration to BUYER's request. Any opinions or requests made by the BUYER entail no alteration of the BUILDER's obligations under the Contract.

(iii)   Where the Work is subcontracted and also when subcontracted to Subcontractors defined in the Makers' List,
(a) the BUILDER shall nevertheless remain fully responsible for the due and proper performance by the same as if it had personally undertaken such Works; and
(b) the BUILDER shall ensure that the terms of any purchase order or agreement under which a Subcontractor agrees to provide goods and/or services contains provisions that title to any equipment and materials to be supplied under any Subcontract to the BUILDER shall pass to the BUILDER upon the same being appropriated to the VESSEL and that the subcontract could be assigned.

**5.      Design**

(i)     BUYER shall be responsible for the Drilling Systems Design, overall weight of the OFE and the Drilling Package in respect of the variable load capability of the VESSEL. BUYER shall be responsible for the drilling systems interface.

(ii)    BUYER shall ensure that the Drilling Package specifications and Drilling System Design are in compliance with the applicable requirements of the Classification Society and Regulatory Bodies with jurisdiction over such design and equipment when such compliance is required for delivery of the VESSEL under the class notation as described in the Specification.

(iii)   BUILDER shall contract with FGM for supply of plans and drawings per Exhibit C



(iii)  BUILDER shall ensure that FGM supplies the Marine Systems Design in accordance with the Construction Schedule. BUYER shall ensure that the Drilling System Design is issued to FGM in a timely manner in accordance with Exhibit C.

(iv)   Such Drilling Package, Specifications and Design shall serve as the basis for the BUILDER to develop VESSEL construction work drawings in accordance with the Contract. The BUILDER shall be responsible for engineering associated with the Marine Systems Design, excluding the design and detailed engineering for the integration of the Drilling Package and Owner Furnished Equipment. The BUILDER shall be responsible for the installation of the Drilling Package and Owner Furnished Equipment.

6.   Title

Title in and to the VESSEL under construction, and all materials and equipment installed onto the Vessel by the BUILDER, whether at the Yard or elsewhere, shall from time to time pass to the BUYER upon payment of each Instalment. Title to the Owner Furnished Equipment shall remain with the BUYER at all times.

Subject to Article XII Clause 2 and Clause 3, BUILDER shall at all times hold title in and to the Vessel, and all materials and equipment not installed onto the Vessel by the BUILDER, whether at the Yard or elsewhere, to the extent of all outstanding payments and/or instalments.

Notwithstanding that BUYER has title to the VESSEL progressively upon payment of each Instalment, BUILDER shall have a lien on the VESSEL for all outstanding instalments due from the BUYER, including claims for damages and for all other amounts due under this Contract, including costs of recovering the same.

7.   Certificates and Registration

(i)    The BUILDER shall provide, deliver and pay for all certificates necessary for the approval of the VESSEL, as further set out in the Contract, together with documents stated in the Specifications and reasonably required by the BUYER necessary for the registration of the VESSEL in Panama (the "Flag State").

(ii)   The VESSEL shall be registered by the BUYER at its own cost and expense under the laws of Panama with its homeport of Panama City at the time of its Delivery and Acceptance hereunder.



## ARTICLE III - PRICE AND PAYMENT TERMS

1.    **Contract Price**

(i)    The Contract Price payable by the BUYER shall be US$ 234,000,000.00 (United States Dollars: two hundred and thirty four million) (the "Contract Price ").

(ii)    The Contract Price shall be subject to upward or downward adjustment only in accordance with the express provisions of the Contract.

(iii)    The Contract Price shall be adjusted upwards or downwards, as the case may be, according to the definitive price for the following packages, considering the difference between the specifications for such packages contained in the Millenium S.A. Specification F&G No. 7152-S, of April 16, 1999, as listed in Exhibit K hereof and the specifications for such packages contained in the Specifications, Exhibit A:

      1.    dynamic position and propulsion package of the VESSEL;
      2.    power generation and power distribution package of the VESSEL;
      3.    anchor winches for the VESSEL; and
      4.    crane capacity and size.

(iv)    For purposes of calculating the adjustment of the Contract Price as provided for in this item "iii" above BUILDER shall, within sixty (60) days as of the Date of Contract, inform in writing to BUYER the price for the above packages as per the relevant specifications contained in the Specifications and in the Millenium S.A. Specification F&G No. 7152-S, of April 16, 1999. Such prices shall be quoted by the same maker, as listed in the Makers List provided for in Exhibit F.

(v)    Within fifteen (15) days as of the presentation by BUILDER of the aforementioned prices, BUYER shall manifest to BUILDER if it approves or not the same and the corresponding adjustment of the Contract Price.

(vi)    If the BUYER does not approve the prices informed by BUILDER, BUYER shall present to BUILDER a substitutive quotation for the referred packages, to be provided by a maker contained in the Makers List provided for in Exhibit F, which quotation shall prevail and be adopted for purposes of the adjustment of the Contract Price. The amount that corresponds to the difference of price of the above mentioned packages shall be calculated on a 'time and materials' rates basis in accordance with Exhibit H. Payment for above shall not be in accordance with Article VI below, but shall be in accordance with the Exhibit D.

(vii)    If the BUYER desires to change the Silicon Control Rectifiers system to VFD system (variable speed drives for the drilling systems, consisting of: phase shifting transformers, control cabinet, variable speed drives, drilling motors control centres) the following procedure shall apply for purposes of adjustment of the Contract Price: (a) BUILDER shall, within sixty (60) days as of the Date of Contract, inform in writing to BUYER the price for each of the referred packages (SCR and VFD); (b) if BUYER decides to adopt the VFD system, the amount that corresponds to the price for the SCR system as presented by BUILDER shall be dully reduced from the Contract Price; and (c) therefore the VFD system shall be changed in the Specifications from package to be furnished by the BUILDER to package to be furnished by the BUYER, as part of the Owner Furnished Equipment, subject to all corresponding terms and conditions established in this Contract.

(viii)    The total steel weight of all steel hull, scantlings, structures and steel outfittings erected, assembled and fitted on the VESSEL shall be 13,191 metric tonnes ("Total Steel Weight"). There shall be no adjustment to the Contract price if in the event upon



completion of the VESSEL the Total Steel Weight is exceeded by two hundred (200) metric tonnes. The Contract Price shall be adjusted if the Total Steel Weight of the VESSEL is in excess of two hundred (200) mtonnes at the rate of USD 3000.00 per exceeding metric tonnes.

2.    **Payment Currency**

(i)    The Contract Price shall be paid by the BUYER to the BUILDER in a basket of currencies and in following proportion of the Contract Price:

United States dollars    - 30%
Renminbi    - 30%
Euro    - 20%
Nor Kroner    - 20%

Exchange rates for above shall be firmly and finally pegged on the day of the Contract signing, as per the page called Reuter FED spot 10 am (for the US dollars, Euro's and Norwegian Kroner) and Reuter SAEC page for CNY-NDF's (for Renminbi).

3.    **Terms and Method of Payment**

(i)    The Contract Price shall be paid in Instalments as per Exhibit D – Instalment Payment Schedule.

(ii)    Payment shall be remitted to BUILDER's bank account within five (5) Banking days after the date of receipt of the electronic invoice and followed by a hardcopy.

(iii)    In connection with the 1st instalment of the Contract Price BUILDER declares and acknowledges to have already received the total amount of US$ 2,238,000 (two million, two hundred and thirty eight thousand United States Dollars).

4.    **Contract Effectiveness**

(i)    Contract Effectiveness shall be such date as parties shall mutually agree, and in any case, no later than the date in which the following conditions precedent have been fulfilled:

(a)    BUILDER received 1st milestone payment .
(b)    BUILDER obtains BUILDER's Board approval to build Vessel to be provided at least three (3) days from the Date of Contract.
(c)    All exhibits to this Contract are signed by BUILDER and BUYER.
(d)    Signed contract between BUILDER and Friede & Goldman Marketing regarding the design of Marine Systems Design.

(ii)    The Effective Date shall be recorded in a correspondence or by way of a side letter signed and acknowledged by both BUILDER and BUYER.

5.    **Change Orders Payment Scheme**

(i)    In respect of Change Orders in excess of US$ 20,000, the BUYER shall pay fifty percent (50%) of the amount of the Change Order on the date of the Change Order, and the balance on completion of the Work required to be carried out pursuant to that Change Order.

(ii)    The BUYER shall make full payment in relation to any Change Orders with a value equal to or less than US$20,000, 30 days as after signing of the Change Orders.

6.    **Payments / Disputes**



(i)  All payments due to the BUILDER shall be remitted to following Banks and accounts, unless otherwise instructed by BUILDER: Bangkok Bank Public Co Ltd, New York Swift code:BKKBUS33 Branch Name: Bangkok Bank Public Co Ltd, Singapore Bank Address:180 Cecil Street Singapore 069546 tel:65-64100400 Account Name: Yantai Raffles Shipyard Limited Swift code: BKKBSGSG/Chip ID:135266 USD CALL A/C No: 0700-400289-412.

(ii)  All the Instalments, unless payable on specific dates, shall fall due five (5) banking days after receipt of an electronic invoice and followed by a hardcopy from the BUILDER. Notice of the instalment payable on Delivery and Acceptance shall include notice of adjustments, if any.

(iii)  In the event of any dispute concerning the payment on Delivery and Acceptance of the VESSEL, including the question of the BUYER's right to offset any claim it may have against the BUILDER, the BUYER shall pay the entire amount demanded by the BUILDER provided that the BUILDER provides a bank guarantee or other security satisfactory to the BUYER equal to the estimated disputed amount. The bank guarantee shall be held by the BUYER until resolution of the dispute. The BUILDER cannot in this case refuse to deliver the VESSEL.

(iv)  Failure by BUYER to pay when due payment under this Contract shall entitle the BUILDER to charge interest at the rate of one (1) per cent (%) per month commencing from the date on which the payment falls due. Failure by BUYER to pay BUILDER when any payments fall due in accordance with this clause shall be deemed a Permissible Delay in respect of the Contract Delivery Date.

(v)  Prepayment of any instalment due on or before delivery of the VESSEL shall be subject to mutual agreement between the Parties hereto.

7.  **Performance bond**

BUILDER shall provide the BUYER with one (1) valid and enforceable Performance Bond of ten (10) percent of the Contract Price, in the form attached as Exhibit J (the "Performance Bond") from a bank or other surety that is satisfactory to the BUYER within 30 days after receipt by BUILDER of the 1st Instalment.

The Performance Bond shall remain valid up till Delivery and Acceptance.



## ARTICLE IV - ADJUSTMENT OF CONTRACT PRICE FOR DELAY - CANCELLATION BY THE BUYER

The Contract Price shall be adjusted following the occurrence of any of the events set out in this Article IV (it being agreed by both parties that any reduction of the Contract Price is by way of liquidated damages and not by way of penalty) and the BUILDER shall not in any way be responsible or liable for any other consequences by way of damages or otherwise as a consequence of any of the matters hereinafter set forth in this Article IV, except for the BUYER's right to cancel the Contract in accordance with the provisions of the Contract.

1.      **Late Delivery**

(i)     If the delivery of the VESSEL is delayed beyond the Delivery Date, then, in such event, beginning at twelve o'clock midnight of the 61st day due to the default of the BUILDER and such delay is not Permissible Delay, the BUILDER shall pay to BUYER liquidated damages as full and final remedy for BUILDER's liability for delay as specified in this Article IV clause 1.

| 1st - 60th day | No Liquidated Damages |
| 61st - 180th day | US$97,500.00 per day |

The maximum amount of Liquidated Damages shall not exceed US$11,700,000.00 (United States Dollars: eleven million and seven hundred thousand)

BUYER may deduct the liquidated damages payable by BUILDER under this Article IV clause 1 from the final instalment.

(ii)    If the Delivery Date does not occur within 180 days after the Contract Delivery Date, the BUYER may at its option cancel this Contract in accordance with the provisions set out in Article XII clause 1.

In the event that the BUYER does not send notice of cancellation as provided for in Article XII hereof within five (5) days of delay having elapsed after the 180th day from the Contract Delivery Date, the BUILDER may demand in writing that the BUYER shall make an election either to cancel the Contract, or to consent to the acceptance of the delivery at a specific future date reasonably estimated by the BUILDER to be the date when the VESSEL will be ready for delivery; in which case the BUYER shall, within fifteen (15) days after such demand is received by BUYER, notify the BUILDER of its choice; it being understood that, if the BUYER elects not to cancel and the VESSEL is not delivered by such future date, the BUYER shall have the right to cancel the Contract.

(iii)   For the purpose of this Article, the delivery of the VESSEL shall be deemed to be delayed when and if the VESSEL, after taking into full account all postponements of the Delivery Date by reason of Permissible Delays and/or any other reasons under this Contract, is not delivered by the date upon which delivery is required under the terms of this Contract.



## ARTICLE V - APPROVAL OF PLANS AND DRAWINGS AND INSPECTION DURING CONSTRUCTION

1. **Approval of Plans and Drawings**

(i) As soon as possible after the Date of Contract, and no later than thirty (30) days before the commencement of cutting of steel the BUILDER shall put forward a proposed Construction Schedule in the format as per Exhibit E. The BUYER shall comment on the building schedule as soon as possible and at the latest within seven (7) days. The BUYER and the BUILDER shall then mutually agree on a list of plans and drawings to be produced by the BUILDER.

(ii) In accordance with the Demarcation List and provisions in the Specifications, the BUILDER shall submit to the BUYER three (3) copies of all plans and drawings produced by the BUILDER for its approval to BUYER's Representative stationed in the Yard, and by electronic copy to the address set forth in Article XVII hereof. The BUILDER shall send a notice by telefax (or by such other electronic means as the parties may agree) to the BUYER giving the date of despatch of such plans and drawings, and the BUYER shall confirm receipt of such plans and drawings. The BUYER's Representative shall within fourteen (14) calendar Days after receipt thereof, send to the BUILDER one (1) copy of such plans and/or drawings with BUYER's approval or comments (if any) written thereon. Such comments shall be as complete as possible. In the event that the BUYER fails to approve or comments and/or return the plans and drawings to the BUILDER within the time limit specified above, such plans and drawings shall be deemed to be approved by the BUYER.

(iii) If BUYER's comments on the plans and drawings are unclear or unspecified, the BUILDER may by fax or email notice to the BUYER request a clarification, and failure by the BUYER or its Buyer's Representative to respond to this request within three (3) Working Days of receipt of such notice shall entitle the BUILDER to place its own reasonable interpretation on such remarks, comments or amendments when implementing the same.

The BUILDER shall amend the drawings to incorporate any comments of the BUYER. If the BUYER's comments amount to a Modification, the provisions of Article VI shall apply. The Parties agree that the correction of errors or inaccuracies in the plans and drawings shall not constitute a Modification.

(iv) If the BUILDER and the BUYER fail to agree whether such comments or remarks are of such a nature or extent as to constitute a Modification, the BUILDER shall nevertheless proceed with the construction based on the BUYER's comments if so requested by the BUYER subject to a decision by the Technical Arbitrator, reference Article XX clause 3. If it is subsequently established by mutual agreement or by arbitration as per Article XX, that the comments, remarks or amendments constitute a Modification or change under Article VI, the provisions of Article VI shall apply.

(v) The BUYER's approval or non approval of plans and drawings shall not affect any of the BUILDER's obligations hereunder, including the BUILDER's obligation to deliver the VESSEL fully approved by the Regulatory Bodies in compliance with the Specifications, or the BUILDER's responsibility under Article X hereof.

(vi) BUYER and BUILDER shall work together to ensure delivery of the VESSEL in the most timely and cost efficient manner.

2. **Appointment of BUYER's Representative**

(i)     The BUYER may send to and maintain at the BUILDER's Yard, at the BUYER's own cost and expense, up to a maximum of 5 representatives, of whom only one (1) shall be duly authorised in writing by the BUYER (herein called the "Buyer's Representative") to act on behalf of the BUYER in attending tests and inspections relating to the VESSEL, its machinery, equipment and outfitting, and in any other matters for which he is specifically authorised by the BUYER.  The remaining 4 representatives shall be designated "Assistants".

(ii)    Unless otherwise advised by the BUYER in writing, the Buyer's Representative shall have no general authority to amend the Contract, provided that the Buyer's Representative shall, however, be authorised to sign Change Orders (as per Article VI clause 1) on behalf of BUYER, unless otherwise advised by BUYER in writing.

(iii)   The Buyer's Representative shall be empowered to approve or disapprove plans and drawings submitted by BUILDER. Commitment(s) and decisions undertaken by BUYER's duly authorized Buyer's Representative shall bind BUYER correspondingly.

(iv)    Notwithstanding any other provisions contained herein, it is agreed that either party will not employ the other party's employees, either directly or indirectly during the term of this Contract or within one year after the termination of this Contract.

3.      **Inspection by Buyer's Representative**

(i)     The inspection of the VESSEL, its machinery, equipment and outfittings shall be carried out by the Classification Society, Regulatory Bodies and the Buyer's Representative and/or his Assistant(s) throughout the entire period of construction, in order to ensure that the VESSEL is duly constructed in accordance with the Contract and the Specifications.

(ii)    Whilst the VESSEL is under construction and until Delivery and Acceptance, the Buyer's Representative and his Assistant(s) shall during all working hours be given free access to the VESSEL, its engines and accessories, and to any materials that are being processed or stored in connection with the construction of the VESSEL at any relevant location, including the Yard, workshops and offices of the BUILDER, and the premises of any Subcontractors who are performing work or storing materials in connection with the VESSEL's construction. The Buyer's Representative and/or his Assistant(s) shall comply with the working schedule and requirement of building, testing and completing the VESSEL, including sea trials, without regard to after office hours or public holidays.

(iii)   The Buyer's Representative and/or his Assistant(s) shall, during the construction of the VESSEL, have the right to attend all tests, trials and inspections undertaken in respect of the VESSEL, its machinery, equipment, appurtenances and outfittings. The BUILDER shall give one day's notice in advance of any such tests and inspections to the Buyer's Representative to enable him or any of his Assistant(s) to attend. Failure of the Buyer's Representative and/or his Assistant(s) to be present at such tests and inspections after due notice to him as above provided shall be deemed to be a waiver of his right to be present.

(iv)    The BUILDER shall produce a Inspection and Test Plan ("ITP") detailing its schedule and programme for testing. The Inspection and Test Plan shall be submitted to the BUYER and the Classification Society for approval at least sixty (60) days prior to the first test of the VESSEL. Inspections and tests of the VESSEL shall be conducted in accordance with the Inspection and Test Plan prepared by BUILDER.

(v)     The Buyer's Representative and his Assistant(s) shall observe and comply with Yard rules and regulations governing conduct of persons in the Yard or in other site where



the work is being performed, particularly with respect to health, safety and environment. BUILDER has a no-smoking rule anywhere within Yard premises.

(vi) The BUILDER shall seek to arrange with its Subcontractors that the Buyer's Representative or his Assistant(s) have a similar right of inspection and supervision in respect of the work performed by the Subcontractor.

(vii) The Buyer's Representative may communicate directly with the Classification Society, but such communication shall not unreasonably interfere with the BUILDER's communication with the Classification Society. The Buyer's Representative may also view relevant non-confidential documents and class records and to a reasonable extent obtain copies of the same. Upon BUYER'S request from time to time, the BUILDER will authorise the Classification Society to provide copies of relevant technical and non-confidential documents to the BUYER.

(viii) In the event that the Buyer's Representative or his Assistant(s) discover any design, construction or material or workmanship that does not conform to the requirements of the Contract, the Buyer's Representative shall immediately advise the BUILDER of such non-conformity. Unless the BUILDER agrees to rectify the matter, a written notice thereof (which may be included in minutes of meeting or similar) shall be given to the BUILDER. Upon receipt of such notice from the Buyer's Representative, the BUILDER shall promptly correct such non conformity, if the BUILDER agrees with his view. If the BUILDER does not agree with the BUYER's view, the matter shall be determined in accordance with Article XX.

(ix) Inspection by the BUYER or a Buyer's Representative shall not alter the BUILDER's obligations under this Contract.

4. Facilities

(i) The BUILDER shall furnish the Buyer's Representative and his Assistant(s) with adequate heated / airconditioned / ventilated project office space for maximum of five (5) persons with table and chairs and 2 telephone (broadband) lines as may be necessary to enable them to effectively carry out their duties.

(ii) All costs for telephone calls and other communication/internet access fridges made by the Buyer's Representative and/or the Assistants, as well as office consumables such as computers, fax machines, printers, fridges etc shall be for the account of the BUYER.

5. Buyer's Representative - Division of Liability

(i) The Buyer's Representative and his Assistant(s) shall at all times be deemed to be the employees of the BUYER and not of the BUILDER.

(ii) The BUILDER shall be under no liability whatsoever to the BUYER, the Buyer's Representative or his Assistant(s), and the BUYER shall indemnify and keep the BUILDER harmless, for personal injuries, including death, suffered during the time when the Buyer's Representative or his Assistant(s) are stationed on the VESSEL, or within the premises of either the BUILDER or its Subcontractor or are otherwise engaged in supervising or inspecting any aspect of the Work, unless, however, such personal injuries, including death, were caused by the gross negligence of the BUILDER, or any of its employees, agents or Subcontractors. The BUYER shall indemnify the BUILDER against any claims or loss arising out of damage to, or loss or destruction of property of the Buyer's Representative or his Assistant(s) unless such damage, loss or destruction is caused by gross negligence or wilful misconduct of the BUILDER, or any of its employees or agents or Subcontractor.

(iii)    The BUYER, the Buyer's Representative and his Assistant(s) shall be under no liability whatsoever to the BUILDER, the BUILDER's employees or Subcontractor, and the BUILDER shall indemnify and keep the BUYER, the Buyer's Representative or his Assistant(s) harmless, for personal injuries, including death, unless such personal injuries including death were caused by gross negligence of the Buyer's Representative or his Assistant(s). The BUILDER shall indemnify the BUYER against claims or loss arising out of the loss or destruction of property of the BUILDER, its employees or Subcontractor unless such damage, loss or destruction were caused by gross negligence or wilful misconduct of the Buyer's Representative or his Assistant(s).

6.    **Responsibility of BUYER**

(i)    The BUYER shall undertake and assure that the Buyer's Representative and his Assistant(s) shall carry out their duties hereunder in accordance with normal shipbuilding practice and in such a way as to avoid any unnecessary increase in building cost and/or delay in the construction of the VESSEL, and/or any disturbance to the construction schedule of the BUILDER.

(ii)    BUYER's Representative and his Assistants shall:

(a)  A minimum of one (1) of the Buyer's representative or his Assistants shall be able to speak Mandarin.

(b)  Follow the working schedule of BUILDER, which may include working after normal hours, public holidays, weekends and seatrials.

(c)  Observe and comply with BUILDER's Health, Safety and Environment (HSE) rules and regulations, including no smoking throughout the Yard's premises.

(d)  Be replaced at BUILDER request, which shall be substantiated, for reasons for unsuitability, intemperance, and/or poor personal conduct. The BUYER shall investigate the situation, and if the BUYER, acting reasonably, considers that such BUILDER's request is justified, the BUYER shall effect such replacement as soon as convenient.

7.    **Construction Schedule**

(i)    Time is of the essence in the construction of the VESSEL. Without prejudice to the foregoing, the VESSEL shall be constructed and completed in accordance with the project plan contained in the Construction Schedule. The Construction Schedule shall identify key progress milestones ("Progress Milestones") and be presented to the BUYER.

(ii)    The BUILDER shall provide the BUYER with a fortnightly report detailing the progress of the construction of the VESSEL which shall include, among other things, any changes to the delivery date, the occurrence of any Permissible Delay and/or Force Majeure Delay, any approved Change Order and any other material issues related to the construction of the VESSEL, including the following:-

(a)    a status report (including level 3 details) on the VESSEL's construction as compared with the Construction Schedule and later modifications thereto,

(b)    an updated Construction Schedule in the format described above

(c)    a list of BUYER's Modifications and Statutory Modifications (if any) agreed during the previous month;



(iii)   The BUILDER shall nominate one of its employees to act as its Project Manager, to whom all communications with regard to this Contract shall be addressed.   The BUILDER shall notify the BUYER in writing of the name and contact details for such person within 28 days of the Effective Date and promptly notify the BUYER in writing of any change thereafter.

(iv)   Without prejudice to the foregoing, the Buyer's Representative and Assistants nominated by the BUYER and the BUILDER respectively shall meet at least once every calendar month to review progress and to discuss any issues that have arisen or are likely to arise.  If they are unable to resolve any issue that is identified to their mutual satisfaction, the matter shall be referred to the senior management of the BUYER and the BUILDER respectively within 14 days of the monthly meeting and will be addressed pursuant to Article XX.   Minutes in writing of the monthly meetings between the Project Managers will be produced and approved as an agreed record of the meeting.

8    Three Dimensional Digital Mock Up

(i)   Within two months of the Effective Date BUILDER shall begin the process of creating a three dimensional digital mock-up of the VESSEL.

(ii)   To ensure that the three dimensional mock-up conforms to the final design requirements of BUYER, BUYER shall provide a team of engineers to supervise the translation by BUILDER of the Specifications and Drawings into BUILDER's three dimensional mock-up program.  Any changes in the design of the VESSEL during the development of the mock-up should not impact the Specifications and/or the Contract Price.  Such three dimensional mock-up, once approved by BUYER, BUILDER and FGM shall be the model from which BUILDER shall begin work under this Contract.  Modifications made to the VESSEL after finally approval of the three dimensional mock-up and after work begins shall constitute a Modification pursuant to Article VI and shall require a change order.

## ARTICLE VI - MODIFICATIONS AND CHANGES

1.      **Modification of Specifications**

(i)     The BUYER is entitled to request a modification or change to the Specifications at any time. The Work to be performed by the BUILDER under this Contract shall be modified or changed ("Modifications") upon request from the BUYER provided that the Parties shall first agree to any necessary adjustment to the Contract Price, the Contract Delivery Date and such other terms and conditions occasioned by or resulting from such Modification. If the parties are able to reach agreement, the BUYER shall issue a Modification order, which shall set out the necessary amendments to the Contract in respect of any Modifications as aforesaid, including any increase or decrease in the Contract Price relating thereto. Adjustments to the Contract Price shall be calculated on a "time and materials" basis, in relation to which the BUILDER shall apply the rates set forth in Exhibit H. BUILDER shall apply a 15% margin on the total of each Modification price calculated in accordance with Exhibit H, for overhead and profit.

(ii)    The BUILDER agrees that any reduction in the scope of works envisaged by this Contract resulting from the implementation of Modifications pursuant to this Article shall result in a reduction of the Contract Price equivalent to the BUILDER's cost saving in respect thereof. Both parties hereby expressly agree that reduction in work scope shall not be greater than ten percent (10%) of the Contract Price. Should the diminution in the work scope be greater than the 10%, BUYER shall pay to BUILDER the profit and overhead margin due to BUYER if there had been no diminution.

(iii)   If the BUILDER and BUYER cannot agree on cost and time impact due to BUYER's request for modifications or changes, and such work is necessary, then the BUILDER will upon BUYER's written request carry out such work and the BUYER and the BUILDER will treat the modification as a Disputed Modification, and the parties shall seek to resolve the dispute by amicable negotiations, failing which the dispute shall be referred to arbitration in accordance with Article XX hereof.

(iv)    The agreed extra cost of a Modification shall be paid by the BUYER in accordance with Article III Clause 5.

(v)     BUILDER shall not carry out any Modification without Buyer's consent.

(vi)    Without prejudice to the first sub-paragraph of Article VI clause 1 above, the BUILDER is entitled to make minor modifications or changes to the Specifications, if found necessary to suit the BUILDER's local conditions or facilities, the availability of materials and equipment, the introduction of improvement methods or otherwise, all of which subject to Class or Regulatory Bodies requirements; provided that the BUILDER shall first obtain the BUYER's approval, which shall not be unreasonably withheld or delayed.

(vii)   The BUILDER may at any time during the execution of the Contract request a Variation to the Work by giving written notice to the BUYER and advising the BUYER of the reasonable effect on the Contract Price and Construction Schedule, provided that it does so within 7 days of becoming aware of the need for such modification. Such request for a Variation to the Work may be accepted or rejected by the BUYER at its sole discretion within seven (7) Days. If the BUYER agrees to the Variation but disagrees as to its impact on Contract Price or Contract Schedule, the BUYER may issue a Change Order in accordance with the BUYER's proposals and refer the matter for resolution in accordance with Article XX.



2.    **Modifications due to non-compliance**

If the BUYER considers any part of the Work not to be in compliance with the Specifications, the BUYER shall advise the BUILDER in writing clearly identifying such a non-compliance and the remedial work required to be carried out by the BUILDER.

3.    **BUILDER's agreement to Non-Compliance:**

(i)    If the BUILDER agrees to the BUYER's claim of non-compliance, the BUILDER shall proceed to remedy the non-compliance at the BUILDER's own cost and time.

(ii)    The BUYER may have the option to accept such non-compliance and seek reasonable compensation from the BUILDER.

(iii)    In respect of the above Article VI clause 3 (ii), the amount proposed for compensation shall not exceed the sum that would have been reasonably provided to the BUILDER to carry out the relevant work under the Contract. The amount of compensation shall be mutually agreed between the Parties hereto failing which the issue shall be referred to arbitration in accordance with Article XX.

4.    **BUILDER's disagreement as to Non-Compliance:**

(i)    If the BUILDER does not agree with the BUYER's claim of non-compliance, the BUILDER shall raise a Variation request in accordance with Article VI and submit to BUYER within ten (10) days from the BUYER's notice of such non-compliance.

(ii)    The BUYER shall have the option to either ask the BUILDER to proceed to remedy the non-compliance and treat the Variation request as a disputed Modification or accept that the work is in compliance with the Specifications and instruct the BUILDER not to proceed with the remedial work.

5.    **Disputed Modifications**

In the event of a Disputed Modification relating to time and/or price, the Parties shall endeavour to discuss and mutually agree to a solution, failing which the issue shall be referred to arbitration in accordance with Article XX, provided that the BUYER provides a guarantee from a financial institution in a wording reasonably acceptable to the BUILDER as payment security for the price of the disputed part of the Modification prior to the Delivery Date.

6.    **Change in Rules and Regulations**

(i)    If, after the Date of Contract, there are any changes in the rules, regulations and requirements (including official changed application of the rules) of Class or Regulatory Bodies (hereinafter "Statutory Modification"), the following shall apply:

(ii)    The BUILDER shall as soon as possible notify the BUYER thereof, which notice shall also advise the BUYER of any adjustments to the Contract Price and/or adjustment of the Contract Delivery Date or any other provisions of this Contract. On the basis of such notification, the BUYER shall no later than seven (7) Working Days thereafter elect, in accordance with the provisions set out below, by notice in writing to the BUILDER either:

(a) to proceed with the Statutory Modification where possible and issue a Change Order in which case the BUILDER shall proceed with the Modification Works; or

(b) BUYER may apply for a waiver of compliance in accordance with the provisions set out in clause (iii) below;



provided always that any changes in such rules, regulations or requirements which are published on or before the Effective Date, and which apply mandatory to the VESSEL on or before the Contract Delivery Date and which shall not give to the BUILDER a right to claim any adjustments to the Contract Price, Contract Delivery Date or other Contract terms.

(iii)    The BUYER may apply for a formal waiver of compliance in respect of a Statutory Modification from the body having power to grant such waiver if the BUYER considers that the operation of the VESSEL in its intended service would permit of such waiver. In applying for any waiver, the BUYER may call upon the BUILDER for assistance and the BUILDER will provide reasonable co-operation to the BUYER in this respect.

(iv)    If no waiver has been obtained and notified by the BUYER to the BUILDER within twenty eight (28) Working Days (or such other period as may be agreed between the parties) of the receipt by the BUYER of the BUILDER's notice referred to in clause (i) above, the BUYER shall be deemed to have authorised the Statutory Modification and to have agreed to the adjustments notified by the BUILDER, in which case the BUILDER shall construct the VESSEL in accordance with the Statutory Modification. Before the expiry of such time period, the BUILDER shall continue with the construction of the VESSEL in accordance with the Statutory Modification but it shall, in so doing, use its best endeavours to minimise any costs and loss of time, in case a waiver is obtained.

(v)    If such change is not or will not be compulsory for the VESSEL, but the BUYER nevertheless desires to incorporate such change, then the BUYER shall notify the BUILDER of such intention and the provisions of clause 1 shall apply.

(vi)    Agreements as to such alterations or changes under this Clause 6 shall be made in the same manner as provided in Clause 1 of this Article for modifications or changes to the Specifications.

7.    Substitution of Materials and Quality Standards

(i)    If any of the materials required by the Specifications or the Maker's List cannot be procured in time or are in short supply, the BUILDER may, in order to maintain the Contract Delivery Date and subject to the BUYER's approval, which shall not unreasonably be withheld and in respect of which BUYER's response shall be provided without undue delay, supply other materials capable of meeting the requirements of the Specifications, Classification Society or Regulatory Bodies. Any changes related to cost and time shall be dealt in accordance with Article VI clause 1 and, except that any savings shall be credited to the BUYER, the Contract shall remain unaltered.    Any agreement as to such substitution of materials shall be effected in the manner provided in Article VI clause 1.

(ii)    Without prejudice to BUILDER's duties under this Contract and under statute, the parties hereto acknowledge that Yard is in the People's Republic of China and where standards and quality complies in full with this Contract, BUILDER, acting reasonably, shall have option, subject to complying with the Specifications, to apply Chinese-made materials and appurtenances, such as steel fittings and the like, insofar as these meet with the requisite Classification and/or statutory requirements.

(iii)    Without prejudice to BUILDER's duties under this Contract and under statute, BUILDER's workmanship standards shall also comply with its standard workmanship practices and quality standards, namely, the China Shipbuilding Quality Standard ('CSQS').



(iv)    BUILDER's Inspection and Test Plan for workmanship shall apply, after discussion and agreement with the Classification Society.

(v)    The BUILDER shall submit the Inspection Plan, Project Quality Plan, Quality Assurance Manual ISO 9001, and Project HSE Plan to BUYER for BUYER's reference One (1) month before steel cutting.

**ARTICLE VII - TEST AND TRIALS**

**1.    Notice**

(i)    The BUILDER shall before the Contract Delivery Date, in accordance with a Class-approved Sea Trial Procedure, by not less than fourteen (14) days written notice to the BUYER, notify the time and place for the sea trial for the VESSEL, and the BUYER shall promptly acknowledge receipt of such notice. The BUYER shall have its Buyer's Representative onboard the VESSEL to witness the sea trial. Failure by the Buyer's Representative to attend at the sea trial without any valid reason despite a notice to the BUYER as aforesaid shall be deemed to be a waiver by the BUYER of its right to be present. BUILDER shall have the option of conducting BUILDER's trials by themselves before the official sea trials. In the event that BUILDER shall not be able to meet the expected sea trial date given, BUILDER shall give notice in writing to BUYER and if the delay is caused by any Force Majeure Event, such delay shall constitute Permissible Delay. Sea trials shall exclude trials of the Drilling Package or any of the systems thereto.

(ii)    The BUILDER may after due notice to the BUYER in accordance with Clause 1 (i) above conduct the sea trial without the Buyer's Representative of the BUYER being present, provided a Representative of the Classification Society is present, and in such case the BUYER shall be obligated to accept the results of the sea trial on the basis of a certificate of the BUILDER confirmed by the Classification Society and/or Regulatory Bodies stating the results of the sea trial.

**2.    Weather Conditions**

(i)    The sea trial shall be carried out under weather conditions as set out in the Specifications. The tests and trials shall be carried out under weather conditions deemed favourable enough in the judgment of the Classification Society surveyor and certified as such at the time to both parties by him. Any delay in the delivery caused by delay of the sea trials due to the BUYER shall be deemed to be Permissible Delay.

(ii)    In the event of unfavourable weather on the date specified for the trial run, the same shall take place on the first available day thereafter that the weather condition permits. It is agreed that, if during the trial run of the VESSEL, the weather should, in the opinion of parties and as agreed by them or certified by the Classification Society, suddenly become so unfavourable that orderly conduct of the trial run can no longer be continued, the trial run shall be discontinued and postponed until the first favourable day next following, unless the BUYER shall assent in writing to acceptance of the VESSEL on the basis of the trial run already made before such discontinuance has occurred.

(iii)    Any delay of trial run caused by unfavourable weather condition shall be a Permissible Delay entitling the BUILDER to postpone the Contract Delivery Date by the period of delay involved.

**3.    How conducted**

(i)    The sea trial shall be carried out upon completion of the VESSEL in the presence of Buyer's Representatives and Representatives from Classification Society and/or Regulatory Bodies, and shall be conducted in accordance with the Specifications, the Sea Trial Procedure, and shall be sufficient in scope and duration to enable all parties to verify and establish that all elements are functioning in accordance with the Contract.



(ii)   All expenses in connection with the sea trial, except those of the BUYER's Representative and its Assistant(s), shall be for the account of the BUILDER, including, without limitation, all necessary crew to comply with conditions of safe navigation.

(iii)  Notwithstanding the foregoing, fuel oil, lubricating oils and greases necessary for the trial run of the VESSEL shall be supplied by the BUILDER at BUILDER's cost. The quantity of fuel remaining in the fuel oil tanks shall be measured and recorded by representatives of both parties. Fuel oil remaining in the main engines and pipelines shall be estimated and added to the fuel oil remaining in the tanks. BUYER shall pay to BUILDER the cost of such fuel remaining in the VESSEL at time of delivery at the cost price purchased by the BUILDER. Fuel and consumables used on and for the Owner Furnished Equipment and systems shall be for account of the Buyer.

**4.     Method of Acceptance or Rejection**

(i)    Upon satisfactory completion of the sea trials and when the trial results are available, if the VESSEL conforms with the Specifications and has passed the sea trials, the BUILDER shall immediately give the BUYER a written notice of completion stating that the VESSEL is ready for delivery. The BUYER shall within forty-eight (48) consecutive hours after receipt of this notice and the test results notify the BUILDER in writing of its acceptance or rejection of the VESSEL.

(ii)   In the event of rejection by BUYER, BUYER must submit to BUILDER a list of defects to be rectified prior to delivery. In case spare parts are required for such rectification and are not available within reasonable time, BUYER will take delivery against an agreed defect list, always provided that the VESSEL can be delivered with its approved trading certificates.

(iii)  If the results of the sea trial demonstrate that the VESSEL has failed the sea trials and/or any part or equipment thereof does not conform to the requirements of the Contract, or if the BUYER for other valid reasons rejects the VESSEL, the BUILDER shall take all necessary steps to rectify such non-conformity. If necessary the BUILDER shall for its own account carry out a further sea trial in accordance with Article VII to ascertain that the VESSEL complies with the terms of the Contract. Upon demonstration by the BUILDER to the reasonable satisfaction of the BUYER that the deficiencies have been corrected, a notice thereof and of the readiness of the VESSEL for delivery, shall be given to the BUYER, who shall then within forty-eight (48) consecutive hours after receipt of such notice together with the new test results notify the BUILDER of its acceptance or rejection.

(iv)   If the BUYER for any reason rejects the VESSEL, the BUYER shall in its notice of rejection give specific and detailed particulars of its reason therefore in such detail as can be reasonably required.

(v)    In the event that the BUYER fails to notify the BUILDER in writing of the acceptance of or rejection together with the reason therefore of the VESSEL within the period as provided for in paragraphs (i) and (ii) above, the BUYER shall be deemed to have accepted the VESSEL.

(vi)   The BUYER shall not be obliged to take delivery of the VESSEL if it is not fully in conformity with the Contract, or if there are any conditions or recommendations imposed by the Classification Society and/or Regulatory Bodies. However, if the deficiencies are of minor importance (such that they can be remedied by an ordinary crew on the transfer of the Vessel from the Yard without disrupting the transfer or operation of the VESSEL or be remedied at the Yard within fourteen 14 days ("Delivery Defects") and the VESSEL is in all other respects substantially complete in conformity with the Contract and there are no conditions or recommendations imposed by Class or



the Regulatory Authorities, the BUILDER may nevertheless require the BUYER to take delivery of the VESSEL, provided that the BUILDER shall at its absolute discretion either :

(a)    undertake for its own account to remedy the deficiencies as soon as possible, or

(b)    compensate the BUYER for the costs incurred in rectifying the defect. If such repairs are undertaken at another repair facility other than BUILDER's yard, then the compensation to BUYER shall be no more than fifty percent (50%) above what it would have cost BUILDER to rectify in the Yard.

The Parties shall, for the purpose of this provision, on delivery draw up a list of Delivery Defects identifying the defects in question. The defects so listed shall be deemed to be Delivery Defects for the purpose of this sub-clause.

(vii)    If the BUILDER disputes the rejection by the BUYER, the dispute shall be submitted for determination in accordance with Article XX hereof.

5.    Effect of Acceptance

Acceptance of the VESSEL as provided above shall be final and binding and shall preclude the BUYER from refusing formal delivery on basis of any alleged deficiency in any part or parts of the VESSEL which were tested during the sea trial, provided all other procedural requirements for delivery have been met. However, the BUILDER shall remain liable for its obligation to deliver the VESSEL in accordance with this Contract.

6.    Disposition of Surplus Consumable Stores

Any fuel oil, unused lubricating oil, grease, fresh water or other consumable stores furnished by the BUILDER for the sea trial, remaining onboard the VESSEL at the time of delivery shall be purchased by the BUYER from the BUILDER at the original net purchase price thereof (BUILDER to provide supporting invoices), and payment therefore shall be effected by the BUYER on Delivery and Acceptance of the VESSEL. Fuel oil remaining in the VESSEL's pipe systems shall be estimated for adding to the total remaining on board.



## ARTICLE VIII – CONTRACT DELIVERY TIME AND PLACE

1. **Time and Place**

(i) The VESSEL shall be delivered afloat at a safe anchorage near BUILDER's Yard thereof free and clear of all liens, claims, mortgages and other encumbrances in a clean and seaworthy condition 34 months after the Effective Date of this Contract (the "Contract Delivery Date"), on condition that the Date of Contract is 12th July 2006 and that the 1st instalment is paid latest by 30 days after Date of Contract. In the event the 1st instalment is not received by BUILDER after the said period, the Contract Delivery Date shall be postponed accordingly, and such delay shall be considered Permissible Delay. In the event of Delays in the construction of the VESSEL or any performance required under the Contract due to causes under which the terms of the Contract permit postponement of the Contract Delivery Date ("Permissible Delay"), the Contract Delivery Date shall be postponed accordingly. The aforementioned date, or such later date to which the requirement of delivery is postponed pursuant to such terms, is herein called the "Delivery Date".

(ii) The BUILDER shall give the BUYER not less than fourteen (14) days' notice of the expected date of delivery of the VESSEL.

2. **When and how effected**

(i) When the VESSEL is ready in all respects for delivery, and the BUILDER has provided the documents in Article VIII clause 3, notwithstanding any claim for liquidated damages by the BUYER, the BUILDER shall deliver a Protocol of Delivery and Acceptance in the format at Exhibit I to the BUYER, which shall be accepted by the BUYER.

(ii) The BUYER shall upon acceptance of the Protocol of Delivery and Acceptance pay to the BUILDER the full instalment and any outstanding payments in respect of Modification orders on Delivery and Acceptance as referred to in Article III clause 3, notwithstanding any alleged claims against the BUILDER, but always without prejudice to the BUYER's rights to refer any dispute as to the amount of liquidated damages payable to arbitration in accordance with Article XX.

(iii) Both parties have the right to make reservations or notes in the Protocol, or in a separate document signed by the parties "for acknowledgement of receipt only".

3. **Documents to be delivered to the BUYER**

Upon Delivery and Acceptance of the VESSEL, the BUILDER shall provide and deliver to the BUYER at BUILDER's expense the following documents, without prejudice to the documents in the Specifications, which shall accompany the Protocol of Delivery and Acceptance:

(a) Protocol of Trials made pursuant to the Specifications.

(b) Protocol of Inventory and Equipment of the VESSEL, including spare parts and the like, all as specified in the Specifications.

(c) Protocol of Surplus Consumable Stores referred to under Article VII clause 6 hereof which are payable by the BUYER to the BUILDER.

(d) Drawings and Plans pertaining to the VESSEL together with all necessary instruction manuals, as further stipulated in the Specifications.



(e)     All Certificates including the BUILDER's Certificate required to be furnished upon Delivery and Acceptance of the VESSEL pursuant to this Contract and the Specifications. Such Certificates are to be clear and free of all qualifications, reservations and recommendations.

(f)     Declaration of Warranty by the BUILDER that the VESSEL is free and clear of any liens, claims, charges, mortgages and other encumbrances.

(g)     Commercial Invoice by the BUILDER for any instalment or other moneys due in accordance with the Contract.

(h)     The following technical documentation:

(i) Four (4) copies and one reproducible of all the "As Built" drawings of the VESSEL required for its operation and maintenance in accordance with its design and purpose.

(ii) Four (4) complete documentation and instructions (Operation and Maintenance) books covering BUILDER supplied equipment;

(iii) Four (4) sets of Operating Manuals and Instruction Books (according to MODU CODE 1989);

(iv) Four (4) copies of a maintenance guide including all drawings;

(v) One (1) copy of all the test and commissioning trials and results which have been done prior to delivery;

(vi) Lightship weight and centre of gravity of lightship weight calculations;

(vii) Bill of Sale or other relevant documents certifying title of the VESSEL into the name of the BUYER;

(viii) American Bureau of Shipping certificate including loadline assignment, cargo gear and Class distinguished in record +A1 M Column Stabilized Drilling unit, +DPS-2, UMS;

(ix) ABS class notation: "+A1 Circle M, Column Stabilized Drilling Unit, +AMS, +DPS-2, +ACCU";

(x) GMDSS Radio Station Certificate;

(xi) Compass Adjustment Certificate;

(xii) Mooring Wire Certificate - for circle M notation;

(xiii) Test certificates for anchor and chain cable - for circle M notation;

(xiv) Certificate of Inspection of Crew Accommodations;

(xv) Data book with calculations and pressure class for all pressure vessels and boilers;

(xvi) Sewage Pollution Prevention Certificate, Marpol Annex 4, Statement of Fact;

(xvii) A Deratization Exemption Certificate;

(xviii) An Application for Admeasurement;



(xix) ABS Cargo Gear Register of Lifting Appliances;

(xx) International Tonnage Certificate (1969);

(xxi) International Oil Pollution Prevention (IOPP) Certificate Marpol Annex 1;

(xxii) International Load Line Certificate (1966)

(xxiii) COLREGS 1972 Certificate

(xxiv) Environmental International Air Pollution Prevention Certificate (EIAPP) Attestation MARPOL Annex 6;

(xxv) Statement of Fact for compliance with UK Civil Aviation Authority CAP 437 for Helideck.

(xxvi) Mobile Offshore Drilling Unit Safety Certificate

4. **Tender of VESSEL**

If the BUYER fails to take delivery of the VESSEL after completion thereof according to this Contract and the Specifications without any justifiable reason, the BUILDER shall have the right to tender delivery of the VESSEL after compliance with all procedural requirements as above provided. Such tender shall constitute Delivery and Acceptance of the VESSEL.

5. **Removal of VESSEL**

The BUYER shall take possession of the VESSEL immediately upon Delivery thereof, and shall remove the VESSEL from the premises of the BUILDER within seven (7) days after the Delivery as aforesaid. If the BUYER does not remove the VESSEL within the said period, the BUYER shall thereafter pay to the BUILDER reasonable mooring charges for the VESSEL.

## ARTICLE IX - DELAYS AND EXTENSION OF TIME FOR DELIVERY (FORCE MAJEURE)

1.    **Cause of Delay**

(i)    In case of the occurrence of a Force Majeure Event, the Contract Delivery Date shall be postponed by the number of days corresponding to the duration of the Force Majeure Event and such delay shall be a Permissible Delay in delivery as set out below. It shall be considered a Force Majeure Event if the Delivery and Acceptance of the VESSEL is prevented or delayed as a consequence of any of the following circumstances or events beyond the BUILDER's control:

Acts of God, acts of princes or rulers, requirements of government authorities, war or other hostilities or preparations therefore, blockade, civil commotion or riots, plagues or other epidemics affecting the majority of the workforce at the Yard including severe acute respiratory syndrome (SARS), Avian flu; floods, hurricanes, earthquakes, tsunamis or tidal waves, unexpectedly strong winds and ocean swells, sabotage, landslides, acts of terrorism, fires, lightning, explosions, collisions or strandings of the VESSEL and so causing damages to the VESSEL and the repairs thereto, strikes affecting the Yard, work stoppages ordered by the national or local governments, national strikes affecting the Chinese shipbuilding industry as a whole, prolonged failure such as shortage or restriction of electric current, oil or gas, or destruction of or damage to the Yard or works of the BUILDER by any causes herein described, nationwide transportation strikes and embargoes of major equipment, delays caused by the Classification Society or other bodies whose documents are required; destruction of or damage to the Yard or works of the BUILDER  or of or to the VESSEL or any part thereof, by any causes herein described delays in the BUILDER's other commitments resulting from any causes herein described which in turn delay the construction of the VESSEL or the BUILDER's performance under this Contract; other causes or accidents beyond control of the BUILDER of the nature whether or not indicated by the foregoing words; where BUYER fails to provide Owner Furnished Equipment in accordance with the timelines stipulated in the Construction Schedule;

Provided always:

That there shall be no Force Majeure Event if such delay could reasonably have been foreseen or anticipated by the BUILDER on the Date of Contract, or that it could have been minimised by the exercise of due diligence by the BUILDER.

(ii)    The provisions under clause (i) above apply whether or not the Force Majeure Event occurs after the Contract Delivery Date.

(iii)    The BUILDER is obliged to use best endeavours to overcome or minimise the effects of the Force Majeure Event.

2.    **Notice of delay**

(i)    Within five (5) days after the BUILDER becomes aware or should have become aware of any Permissible Delay, on account of which the BUILDER will claim that it is entitled under the Contract to postpone the Contract Delivery Date, the BUILDER shall notify the BUYER in writing by confirmed telefax or email, confirmed by registered mail, of the date such cause of delay commenced. Likewise, within five (5) days after the date such cause of delay ended, the BUILDER shall notify the BUYER in writing by confirmed telefax or email, confirmed by registered mail, of the date when such cause of delay ended.



(ii)    Failure by the BUILDER to give such notices as aforesaid shall prevent the BUILDER from subsequently claiming relief for a Permissible Delay.

(iii)   The parties shall discuss and agree the period by which the Contract Delivery Date is postponed by reason of such Permissible Delay, with all reasonable despatch after it has been determined. If the parties are unable to agree the extent to which to amend the Contract Delivery Date, the matter shall be determined in accordance with Article XX.

3.    **Definition of Permissible Delay**

(i)    Delays on account of such causes as specified in this Article IX clause 1 and in Article VI hereof or any other delays of a nature which under the terms of this Contract permit postponement or extension of the Contract Delivery Date shall constitute Permissible Delay and shall extend the Contract Delivery Date by the period equal to such delay.

(ii)   Delays in the arrival of Owner Furnished Equipment, including but not limited to test and commissioning engineers and supervisors, necessary final-approved plans, installation manuals and tools at the Yard, related to the Owner Furnished Equipment.

(iii)  Any delays caused by defect in the Owner Furnished Equipment, including due to trials or testing, shall constitute a Permissible Delay, unless such defect has been caused either directly by the BUILDER.

(iv)   Delayed delivery of the engines up to 60 days

(v)    Delays in the receipt by FGM of Drilling Systems Design and OFE plans and drawings identified in Exhibit C.

## ARTICLE X - WARRANTY OF QUALITY

1. **Extent of BUILDER's responsibility**

(i)    Save as provided for below, and provided always that the deficiencies have been rectified within a reasonable time, the BUILDER shall have no responsibility for defects or for any direct, indirect, consequential or special losses, damages or expenses including but not limited to loss of time, loss of profit or earning or demurrage directly or indirectly occasioned to the BUYER by reason of the defects specified in clause 2 of this Article or due to repairs or other works done to the VESSEL to remedy such defects discovered after the Delivery and Acceptance of the VESSEL.

(ii)   The BUILDER shall not be responsible for any defects in any part of the VESSEL which may subsequent to delivery of the VESSEL have been replaced or in any way repaired by any contractor, or for any defects which have been caused or aggravated by omission or improper use and maintenance of the VESSEL on the part of the BUYER, its servants or agents or by ordinary wear and tear or by any other circumstances beyond the control of the BUILDER.

(iii)  In any event, and notwithstanding anything in this Contract, in no circumstances shall the BUILDER be liable, in contract, tort (including negligence or breach of statutory duty) or otherwise howsoever, and whatever the cause thereof,
       (a)    for any increased costs or expenses, or
       (b)    for any loss of profit, business, contracts, revenues, or anticipated savings, or
       (c)    for any special, indirect or consequential damage of any nature whatsoever.

(iv)   Unless otherwise provided in this Contract all liability for negligence or breach of contract on the part of the BUILDER in relation to the condition of the VESSEL shall cease from and after the Delivery and Acceptance of the VESSEL.

2. **Guarantee**

(i)    The BUILDER undertakes to repair and rectify at its own cost and expense and free of charge to the BUYER, concerning the VESSEL or parts thereof, which are caused by defective material and/or poor workmanship on the part of the BUILDER, its servants, employees or Subcontractor with regards to BUILDER's scope of work under this Contract, for a period of twelve (12) months after Delivery and Acceptance hereof.

(ii)   The BUILDER shall not be responsible for any defects in any part of the VESSEL which may subsequent to delivery of the VESSEL have been replaced or in any way repaired by the BUYER (except for those temporary repairs or replacements made by BUYER to prevent more severe damage), or for any defects which have been caused or aggravated by omission or improper use and maintenance of the VESSEL on the part of the BUYER, its servants or agents or by ordinary wear and tear or by any other circumstances beyond the control of the BUILDER.

(iii)  For the purposes of this Article, the VESSEL shall include her hull, machinery, equipment and gear, but excludes the Drilling Package and any other Owner Furnished Equipment save where such parts have been incorporated into the VESSEL by the BUILDER and the claim relates to such work of incorporation, including materials or workmanship relating to the incorporation. The parties agree that in the event of any conflict between this Article and the Demarcation List, the Demarcation List shall take precedence.

(iv)   The Guarantee Period shall be extended for a further period of twelve (12) months in respect of any repairs carried out by the BUILDER, provided that the BUILDER's liability in respect of defects shall, in no event, exceed 18 months from the date of the delivery of the VESSEL. The BUYER shall, however, not be entitled to such additional guarantee for deficiencies caused by poor workmanship if the guaranteed work has not been performed by the BUILDER or their Subcontractor.

3.   **Rectification of Defects**

(i)   Any such defects shall be notified to the BUILDER as soon as possible after discovery. Such notice shall include particulars of the deficiency in such detail as can reasonably be expected. The BUYER's notice shall include such particulars as can reasonably be given as to the nature of such defect, the date of discovery and the place at which the VESSEL can be made available for earliest inspection by or on behalf of the BUILDER. The BUYER shall furnish to the BUILDER as soon as practicable copies of any relevant survey or inspection reports. BUYER is obliged to use its best efforts to prevent or minimise the consequential effects of such defects.

(ii)   The BUYER may require the BUILDER to make good any defect for which the BUILDER is liable under this Article X by giving notice of such requirement to the BUILDER. Any parts replaced shall on their removal become the property of and shall be at the risk of the BUILDER whilst the replacement parts fitted to the VESSEL shall upon fitting become the property of the BUYER.

(iii)   The BUILDER shall execute the necessary work including the carrying out of any essential dismantling and reassembling with the utmost despatch in accordance with the quality standards which are applicable hereunder to the VESSEL's original construction.

(iv)   Where it is impractical and not reasonably feasible, having regard to the then location of the VESSEL or for any other reason, for the BUILDER to make good the defect on the then location of the VESSEL or at the Yard, save always that the BUILDER is entitled to nominate a yard suitable for such purpose for the BUYER's approval. If the BUYER agrees such yard is acceptable, the BUILDER shall arrange for the making good of the defect and the carrying out of any essential dismantling and reassembling at the BUILDER's own risk and expense. The BUILDER shall render all possible support and assistance to the yard it has nominated, that yard being deemed to be a Subcontractor of the BUILDER, the BUILDER being responsible for the performance by that yard as if were performance by the BUILDER itself.

(v)   Should the BUYER for good reason consider the yard nominated by the BUILDER unacceptable, and elect to have the work referred to above carried out elsewhere, the BUYER may contract with a yard acceptable to it for performance of the corrective work. In such case the BUILDER shall pay to the BUYER for repairs and/or replacements such sum as it would have cost if the BUILDER had repaired the defects in its own Yard, plus a premium of fifty percent (50%). The BUILDER shall, at its own expense, have its own representative in attendance during execution of the corrective work and shall render fully support, advice and cooperation to the BUYER. The BUYER shall instruct that any parts included formerly in Materials and replaced under this clause are returned to the BUILDER (if required by the BUILDER) at the BUILDER's expenses, and in such case those parts returned shall on their replacement become the property of and shall be at the risk of the BUILDER.

(vi)   BUYER shall provide transportation of BUILDER's spares and/or Subcontractor service engineers from the nearest convenient port to the location where VESSEL is at the time. Food and lodging on board, where needed shall be provided free of charge to same.

(vii)    BUILDER shall not be liable for the costs of any downtime, secondary, collateral or consequential losses to BUYER on account of any defects occurring. Costs of de-mobilization and re-mobilization of VESSEL shall be for BUYER's account.

(viii)    With effect from Delivery and Acceptance, the guarantee contained as hereinabove in this Article replaces and excludes any other liability, guarantee, warranty and/or condition imposed or implied by the law, customary, statutory or otherwise, by reason of the construction and sale of the VESSEL by the BUILDER for and to the BUYER.

4.    **Subcontractor' Guarantees**

The BUILDER shall assign to the BUYER any rights the BUILDER may have against any Subcontractors and Suppliers, including any right to pursue any claim under the relevant subcontract. Upon assignment, the BUYER shall in the first instance communicate with the relevant Subcontractors in relation to service or repairs, and any arrangements thereto. Should the Subcontractors in question fail to respond or fails to comply with its obligations under the original contract BUILDER executed with Subcontractors, then the BUILDER shall be responsible for communicating with the Subcontractor and attempt to procure for the BUYER the necessary services and/or parts. This provision shall in no way alter or diminish the BUILDER's obligations under the Contract. For the purpose of this clause, Subcontractor's guarantee does not extend to Subcontractor's workmanship and BUILDER shall deal directly with the Subcontractor in respect of any claims regarding Subcontractor's workmanship.

5.    **The Guarantee Engineer**

(i)    The BUILDER may appoint a guarantee Engineer to serve onboard the Vessel for such portion of the guarantee period as the BUILDER considers appropriate.

(ii)    The Guarantee Engineer shall, at all times and in all respects, be deemed to be an employee of the BUILDER. The BUILDER shall indemnify the BUYER against all loss or claims arising for personal injuries, including death, suffered by the Guarantee Engineer during the time when he is on board the VESSEL, unless such personal injuries, including death, were caused by negligence of the BUYER, or of any of its employees or agents. The BUILDER shall indemnify the BUYER for damage to or loss of or destruction of property of the Guarantee Engineer, unless such damage, loss or destruction is caused by gross negligence of the BUYER, or of any of its employees or agents.



## ARTICLE XI - RISK AND INSURANCE

**1.    Risk and Liability**

(i)    The VESSEL and all materials shall be and remain at the sole risk of the BUILDER until the Delivery Date.

(ii)    The BUYER may mortgage the VESSEL and its materials supplied (if applicable) as security for the construction financing for the VESSEL. The BUILDER shall if necessary give its consent for that purpose.

**2.    Liabilities and Indemnities**

(i)    **Knock for knock**

(a)    The BUYER shall indemnify and keep the BUILDER harmless, for all losses and claims arising out of personal injuries, including death, suffered by the BUYER during the time when the BUYER is on the VESSEL, or within the premises of either the BUILDER or its Subcontractor or are otherwise engaged in or about the construction of the VESSEL. Subject to Article XI clause 1(i) above, the BUYER shall indemnify the BUILDER against all claims or losses suffered by the BUYER arising out of damage to, or loss or destruction of property of the BUYER, whether owned, hired, leased, or chartered .

(b)    The BUILDER shall indemnify and keep the BUYER harmless, for all losses and claims arising out of personal injuries, including death suffered by the BUILDER, its employees, agents, Buyer's Representatives and Subcontractors. Subject to Article XI clause 1(i) above, the BUILDER shall indemnify the BUYER against all claims or losses suffered by the BUILDER, its employees, agents, Buyer's Representatives and subcontractors arising out of damage to, or loss or destruction of property of the BUILDER whether owned, hired, leased, or chartered.

(ii)    **Third Party Liability**

(a)    Up to and after Delivery and Acceptance, the BUYER shall defend, indemnify and hold harmless the BUILDER from any costs, claims or proceedings (including consequential losses) incurred by the BUYER which arise as a result of actions or proceedings instituted by third parties in connection with the BUYERS' performance under this Contract.

(b)    Up to Delivery and Acceptance, the BUILDER shall defend, indemnify and hold harmless the BUYER from any costs, claims or proceedings (including consequential losses) incurred by the BUILDER which arise as a result of actions or proceedings instituted by third parties in connection with the BUILDER's performance under this Contract.

(iii)    **Exclusion of Consequential Loss**

(a) Neither party shall not be liable for any damage, loss, costs or expenses whatsoever whether arising directly, indirectly, or consequent on any tort, liability, obligation or responsibility howsoever arising under this Contract, including negligence and/or breach of duties under this Contract, for damages of whatever description or nature including but not limited to loss of use or downtime or



production, loss of product, loss of profit, loss of any contract or opportunity, loss of goodwill or financing costs.

(b) Each Party shall defend, indemnify and hold harmless the other Party against such losses or damages regardless whether any such loss of damage is due to the negligence or breach of duty (whether statutory or otherwise) of any member of the indemnified Party.

(c) The Buyer further undertakes to indemnify the Builder in respect of any such claim by a third party through and/or against the Buyer. The terms of this Clause shall survive any termination of this Contract and shall continue in full force and effect.

(d) The total maximum aggregate liability of the Builder shall be limited to the maximum amounts payable under Article IV (liquidated damages) and amounts payable under Article III, Clause 7 (Performance Bonds).

**(iv)     Precedence**

(i)     The indemnities and limitations under this Article XI clause 2 shall take precedence over any other conflicting provision of the Contract and shall continue to be binding on BUYER and BUILDER notwithstanding completion or termination of the Contract.

(ii)     The indemnities and limitations under this Article XI clause 2 shall apply irrespective of cause and notwithstanding the negligence or breach of duty (whether statutory or otherwise) of the indemnified Party and shall apply irrespective of any claim in tort, under contract or otherwise at law.

**(v)     Third Parties**

No person who is not a party to this Contract shall have any right to enforce the terms of this Contract whether under the Contracts (Rights of Third Parties) Act 1999 or otherwise.

**3.     Risk Insurance**

(i)     The BUILDER will arrange and pay for BUILDER's Risk Insurance (which shall not include Owner Furnished Equipment) with reputable Chinese underwriters acceptable by BUYER and such acceptance shall not be unreasonably withheld: on customary "All Risk" terms, inclusive of war risk. The insurance shall comprise necessary fire and transport insurance of material and equipment, which the BUILDER procures from Subcontractors. Except as otherwise agreed the BUILDER is not obliged to insure the transport of Owner Furnished Equipment. BUILDER's Risk Insurance coverage for the full Contract Price shall commence upon the arrival or delivery to the Yard (or its Subcontractor) of major equipment or Owner Furnished Equipment, whichever is earlier.

By paying extra insurance premiums the BUYER may require that the building insurance is increased to cover the rebuilding value at any time.

Upon request by BUYER, BUILDER shall insure Owner Furnished Equipment at cost plus a margin of 15% for the sums to be insured as advised by BUYER.

The BUYER shall receive copies of the policies.

(ii)     (a)     The insurance policies shall be taken out in the joint names of the BUILDER and the BUYER and they shall be co-assureds.

(b)   Employers Liability and/or Workmen's Compensation Insurance covering personal injury to or death of the employees of the BUILDER engaged in the performance of the works under this Contract to the minimum value required by any applicable legislation;

(c)   General Third Party Liability Insurance for any incident or series of incidents covering the operations of the BUILDER in the performance of this Contract in an amount not more than US$ 1,000,000.00 per incident; and

(d)   Third Party and Passenger Liability insurance and other motor insurance as required by the relevant jurisdiction where the works under this Contract are to be performed.

(iii)   BUILDER shall furnish the BUYER with certified copies of the above policies and the originals shall be made available to the BUYER, its employees or agents for inspection at all reasonable times. Above insurances shall be taken up by BUILDER immediately upon the arrival of the first major equipment into the Yard.

(iv)   Failure by the BUILDER to comply with the provisions of this Clause 3 shall be deemed to be a material and fundamental breach of this Contract.

4.   **Loss or Damage to the VESSEL**

(i)   Should the VESSEL or any items insured pursuant to the provisions of Clause 3 sustain loss or damage prior to Delivery and should such loss or damage not make the VESSEL a total loss, actual, constructive, arranged or compromised, the BUILDER shall, at its own expense and with all due despatch, make good such damage in accordance with the provisions of this Contract and the Specifications.

(ii)   Should the VESSEL sustain loss or damage prior to Delivery and Acceptance hereunder such that it is either conceded by the insurers liable therefor, or determined by a court of competent jurisdiction, that the VESSEL has become a total loss, actual, constructive, arranged or compromised, then the BUILDER and the BUYER shall within twenty-one (21) Working Days or such other period as mutually agreed thereof decide whether to continue with the construction of the VESSEL or to cancel the Contract. In the event that the Parties cannot agree within such time whether to continue with the construction of the VESSEL or to cancel the Contract, the Contract shall be deemed to be cancelled, and in such event, the 'Parties' obligations under this Contract shall thereupon cease and terminate, and neither Party shall have any claim for any losses and/or damages and/or consequential losses against the other Party thereafter.

## ARTICLE XII - DEFAULT PROVISIONS

### Default by the BUYER

1.   **Events of BUYER's Default**

(i)   The BUYER shall be deemed to be in default of performance of its obligations under this Contract in the following cases:

a)   If the BUYER fails to pay the amount of any of the instalments of the Contract Price due to the BUILDER in the period prior to Delivery within thirty (30) days from the due date for payment thereof; or



b) If the BUYER fails without justification to take Delivery and Acceptance of the VESSEL in accordance with this Contract and to pay the final instalment including any outstanding Change Orders due thereon;

c) if an order or an effective resolution is passed for the winding up of the BUYER (other than for the purposes of a reconstruction or amalgamation previously approved by the BUILDER); or if a receiver is appointed over the whole or any part of the undertaking or property of the BUYER; or if the BUYER becomes insolvent or suspends payment generally of its debts; or ceases to carry on its business; or makes any special arrangement or composition with its creditors;

d) If the BUYER fails for a period of sixty (60) days after notice in writing to deliver Owner Furnished Equipment, including but not limited to the Drilling Package, within the timelines stipulated in the Construction Schedule; or

(ii) If the BUYER is in default as to the payment of any instalment as provided in clauses (a) or (b) above, then without prejudice to any other rights of the BUILDER or of the BUYER, the BUYER shall pay interest at 1 per cent per month on the unpaid amount from the day on which the same became due to the BUILDER up until the date of actual payment thereof. The BUILDER shall further be entitled to claim as Permissible Delay any period of time during which the construction or completion of the VESSEL has been unavoidably delayed in consequence of the BUYER's defaults under this Article XII.

(iii) If aforesaid default on the part of the BUYER continues for a period of thirty days after notice in writing has been given by the BUILDER to the BUYER requiring such default to be remedied, the BUILDER shall have the right at its sole discretion to terminate this Contract by giving a further written notice to the BUYER. Such notice of termination shall be effective from receipt thereof by the BUYER, but in any event no later than seven days from date of such notice to BUYER.

**2.    Events of BUILDER's Default**

The BUYER may terminate, after giving notice in writing to BUILDER thereof, all or any part of the Contract if:

a.    Delivery is delayed by more than one hundred and eighty (180) days, and such delay is not Permissible Delay, or

b.    BUILDER becomes insolvent or insolvency, receivership or bankruptcy proceedings shall be commenced against BUILDER or are initiated by BUILDER.

c.    BUILDER disregards the decision of the Technical Arbitrator under a Technical Dispute.

**3.    Termination by any Party**

(i)    In the event of termination of this Contract in accordance with this clause the following principles shall apply:-

a) The BUILDER shall immediately cease performance of the Works hereunder and shall (a) complete all works required as a minimum to permit the VESSEL to depart from the Yard in a safe and seaworthy condition (b) thereafter remove its employees, agents and sub-contractors, together with their equipment (excluding materials) from the VESSEL and (c) render all necessary assistance to the VESSEL in leaving the Yard within 7 days of the completion of all of the works required to permit the VESSEL to depart from the Yard in accordance with (a) above.



b) The BUILDER shall allow or procure for the benefit of the BUYER or its agents full rights of access to the Yard and Subcontractors' premises to take over the VESSEL, all materials and Owner Furnished Equipment and allow the BUYER to remove the VESSEL, materials and Owner Furnished Equipment (together with all drawings, plans and other documents prepared during the course of the project relating to the detailed design, engineering and construction of the VESSEL which are necessary to complete the VESSEL elsewhere) from the Yard and Subcontractors' premises in such manner as the BUYER may direct and the BUYER shall remove the same as soon as practicable.

c) The BUILDER shall execute and deliver to the BUYER all documents required by the BUYER, and take all steps necessary, to (a) vest fully in the BUYER, the rights and benefits of the BUILDER under any existing orders or agreements with its Subcontractors, and related security and (b) to facilitate the removal of the VESSEL, Materials and Owner Furnished Equipment from the Yard and Subcontractors' premises and from China where applicable (in respect of which, at the BUYER's request, the BUILDER shall provide all assistance required to obtain permission from the relevant authorities for the export from China of the VESSEL, materials and Owner Furnished Equipment.

d) In the event of BUILDER default, BUYER may cancel this Contract pursuant to this Article XII, and BUYER shall take possession of the VESSEL "as is where is", with full ownership thereof, subject to payment of all instalments that remain due at the time of cancellation and payment of the work done to the time of cancellation on a quantum meruit basis. Accordingly, BUYER shall be entitled to repayment from the BUILDER of the work that has not been done although paid for by the BUYER on a quantum meruit basis. Pursuant to this clause, a third party appraiser mutually agreed by the parties shall issue a statement after due assessment of the state of completion of the Vessel at the time of default setting out (a) the instalments that remain due at the time of cancellation, (b) the work done or not done to the time of cancellation on a quantum meruit basis. This statement of account shall be deemed to be conclusive evidence of the amount due and payable by the BUYER to the BUILDER upon BUYER's cancellation.

e) In the event of BUYER default, BUILDER may cancel this Contract pursuant to this Article XII, BUYER shall take possession of the VESSEL "as is where is", with full ownership thereof, subject to payment of all instalments that remain due at the time of cancellation, payment of the work done to the time of cancellation on a quantum meruit basis, and 15 % of the work that has not been done as profit. Pursuant to this clause, a third party appraiser mutually agreed by the parties shall issue a statement after due assessment of the state of completion of the Vessel at the time of default setting out (a) the instalments that remain due at the time of cancellation, (b) the work done to the time of cancellation on a quantum meruit basis and (c) the profit that would have been accrued. This statement of account shall be deemed to be conclusive evidence of the amount due and payable by the BUYER to the BUILDER upon BUYER's cancellation.

f) In addition, the BUYER shall reimburse to the BUILDER within ten (10) Banking Days of written demand such costs and expenses as are incurred by the BUILDER in performing its obligations under sub-clauses (i), (ii) and (iii) which have not otherwise been paid or taken into account provided that such costs and expenses are reasonable and properly documented.

g) Notwithstanding the above, if there is a dispute in respect of the BUYER's payment obligation, the BUILDER has no right to postpone the commencement or stop the Work or cancel the Contract, if the BUYER provides security reasonably acceptable to the BUILDER for the disputed unpaid amount, unless BUILDER has no reasonable means to continue Work on the Vessel.

## ARTICLE XIII - ASSIGNMENT

(i)     The BUYER may, with the prior written approval of the BUILDER, (which shall not be unreasonably withheld or delayed), assign the benefit of this Contract. The BUILDER hereby approves the assignment by the BUYER of the benefit, but not the obligations of this Contract to any wholly owned subsidiary of the BUYER or to any financiers of its purchase of the VESSEL.

(ii)    The BUILDER shall not assign its benefit in this Contract, without the prior written consent of the BUYER, which shall not be unreasonably withheld.

(iii)   The Contract shall inure to the benefit of and shall be binding upon the lawful successors or the legitimate assigns of either of the parties hereto.

## ARTICLE XIV - TAXES AND DUTIES

(i)     Taxes and Duties in the country of the BUILDER

The BUILDER shall bear and pay all taxes and duties imposed in the country of the BUILDER in connection with the execution and/or performance of the Contract, but excluding any taxes and duties imposed in the country of the BUILDER upon the Owner Furnished Equipment, or income tax, if any, imposed on BUYER's Representatives by the People's Republic of China.

(ii)    Taxes and Duties outside the country of the BUILDER

The BUYER shall bear and pay all taxes and duties imposed outside the country of the BUILDER in connection with the execution and/or performance of the Contract, except for taxes and duties imposed upon those items to be procured by the BUILDER for construction of the VESSEL.

## ARTICLE XV - INTELLECTUAL PROPERTY, PATENTS, TRADEMARKS, COPYRIGHTS

(i)     Machinery and equipment of the VESSEL may bear the patent numbers, trademarks or trade names of the manufacturers.

(ii)    BUILDER shall remain the owner of all intellectual property rights relating to the relevant studies, drawings, models, and documents pertaining to the construction work drawings and construction of the VESSEL and equipment. All rights, title and interest in inventions made by the BUILDER during and as a result of the performance of the work, shall also belong to the BUILDER and the BUILDER shall have the sole right to file applications for patents, copyrights or other intellectual property rights. BUILDER shall provide BUYER a non-exclusive, royalty free licence to use such intellectual property rights to the extent necessary for the operation, maintenance and repair of the VESSEL and equipment. The license shall be freely assignable for the sole purpose of selling the VESSEL and equipment.

(iii)   The BUILDER shall be liable for patent, trade mark, copyright or other intellectual property liability or claims of any nature or kind, including costs and expenses for, or on account of any intellectual property rights made or used in the performance of the Contract, except for Owner Furnished Equipment, Drilling Package, Drilling System Designs and the BUYER's use of the VESSEL.

(iv)    In the event that the joint survey shows that the design of the VESSEL and equipment needs to be changed in order to avoid any infringement or alleged infringement of third party intellectual property rights <u>BUILDER</u> shall assume responsibility for all costs of redesign, manufacture, fabrication, commissioning, testing and delivery and shall indemnify and hold the BUYER harmless from and against all such costs, except for Owner Furnished Equipment, Drilling Package, Drilling System Designs.

(v)    BUYER and BUILDER shall inform each other immediately of any infringement of alleged infringement. BUYER and BUILDER agree to provide all necessary information and assistance to rebut such claims or defend such suit. Neither Party shall make any voluntary admissions before discussing the same with the other Party.

(vi)    The BUILDER's indemnity hereunder does not extend to the Owner Furnished Equipment.

(vii)    For the avoidance of doubt, any information supplied by any of the parties to this Contract herein shall remain the property of that party, and the other parties shall have no rights to utilise such information unless such information was within the public domain as at the Date of Contract.


## ARTICLE XVI - OWNER FURNISHED EQUIPMENT AND DRILLING PACKAGE

**1.    Responsibility of BUYER**

(i)    The BUYER shall, at its own risk, cost and expense, supply and deliver to the BUILDER all of the items to be furnished by the BUYER, including the Drilling Package, as specified in the Specifications (hereinafter called the "Owner Furnished Equipment") at warehouse or other storage facility of the BUILDER in a proper condition ready for installation in or on the VESSEL, in accordance with the time schedule set out in the Construction Schedule, Exhibit E. BUYER shall ensure that all Owner Furnished Equipment, including the Drilling Package, are properly packed for transport, storage and preservation before shipment to BUILDER's Yard.

In the event that delays are significant and affect BUILDER's production progress, the time impact of such shall be addressed under Article VI Clause 1 'Changes and Modifications', as change orders, subject to mutual agreement, and shall be considered as Permissible Delays.

(ii)    In order to facilitate installation by the BUILDER of the Owner Furnished Equipment in or on the VESSEL, the BUYER shall furnish the BUILDER with necessary specifications, plans, drawings, instruction books, manuals, test reports and certificates required by all applicable rules, regulations, and approved for construction. If so reasonably requested by the BUILDER, the BUYER shall without any charge to the BUILDER, provided always that such installation is not BUILDER's responsibility pursuant to the Specifications, cause the BUYER's Representatives of the manufacturers of the Owner Furnished Equipment to assist the BUILDER in installation thereof in or on the VESSEL and/or to carry out installation thereof by themselves or to make necessary adjustments at the BUILDER's Yard. Testing and commissioning work shall be undertaken by Buyer's engineers, with BUILDER assisting where needed.

(iii)    Any and all of the Owner Furnished Equipment shall be subject to the BUILDER's reasonable right of rejection, when and if they are found to be unsuitable or in improper condition for installation. However, if so requested by the BUYER, the BUILDER may repair or adjust the Owner Furnished Equipment without prejudice to



the BUILDER's other rights hereunder and without being responsible for any consequences therefrom. In such case, the BUYER shall reimburse the BUILDER for all reasonable costs and expenses incurred by the BUILDER in such repair or adjustment and the Contract Delivery Date shall be automatically postponed for a period of time necessary for such repair or replacement. For avoidance of doubt, it is agreed by the Parties that the Owner Furnished Equipment shall be delivered to BUILDER'S Yard with transportation insurance for the account of BUYER, until the Owner Furnished Equipment are offloaded by BUILDER in its Yard, and all such supplies shall be fully assembled and in a condition to be installed onto the VESSEL by BUILDER.

(iv)    Should the BUYER fail to deliver any of the Owner Furnished Equipment and/or related engineering design, plans and drawings (for the avoidance of doubt, excluding the Marine Systems Design) within the time designated, the Contract Delivery Date shall be automatically extended for the period by which the failure actually caused a delay in the delivery of the VESSEL. All engineering designs where applicable shall have full Classification and/or statutory approval prior to delivery to BUILDER.

(v)     If delay in delivery of any of the Owner Furnished Equipment exceeds twenty-one (21) day from the timelines stated in the Construction Schedule, then the BUILDER shall be entitled to proceed with construction of the VESSEL without installation thereof in or on the VESSEL as hereinabove provided, and the BUYER shall accept and take delivery of the VESSEL so constructed, unless such delay is caused by the occurrence of a Force Majeure Event in which case the provisions of Article XVI clause 1(iv) shall apply.

(vi)    All expenses and risk in connection with the owner furnished equipment engineers shall be for BUYER's account.

2.      Responsibility of BUILDER

(i)     The BUILDER shall be responsible for storing and handling with due diligence the Owner Furnished Equipment after delivery thereof at the BUILDER's Yard, and shall, at its own cost and expense, inclusive of materials, consumables and yard facilities, and install them in or on the VESSEL, unless otherwise provided herein or agreed by the parties hereto, provided always, that the BUILDER shall not be responsible for the quality, efficiency and/or performance of any of the Owner Furnished Equipment.

(ii)    Save always with BUILDER's consent, BUILDER shall supply manpower and Yard facilities to assist BUYER's engineers to test and commission the Owner Furnished Equipment. Delays in the tests and commissioning work on the Owner Furnished Equipment shall be considered as Permissible Delays.

(iii)   Presence of Owner Furnished Equipment' engineers shall be governed by the rules and regulations of the Yard, and their conduct be bound accordingly.

## ARTICLE XVII - NOTICES

### 1.    Address

Notification given to either the Builder or the Shipyard shall be deemed to be notice to both and shall constitute notice to the BUILDER. Any and all notices and communications in connection with the Contract shall be addressed as follows:

**To the BUYER:**

| | | |
|---|---|---|
| Name | : | Rodrigo Francisco De Almeida Lopes, or otherwise nominated |
| Mobile | : | +55 21 9873 0579 |
| Office Tel | : | +55 21 3861 3900 |
| Telefax | : . | +55 21 3861 3905 |
| Address | : | Av. Graca Aranha 182 12 Andar Centro Rio de Janeiro RJ 20030 001, Brazil |
| Email | : | rlopes@schahin.com.br |

**To the Builder:**

| | | |
|---|---|---|
| Name | : | Mr. Mark Van Leeuwen, or otherwise nominated |
| Mobile | : | +86 135 83570730 |
| Office Tel | : | +86 535 6801451 |
| Telefax | : | +86 535 6828 419       : |
| Address | : | No.70, Zhifu East Road, Zhifu Island, Yantai 264000, Shandong Province, P.R. OF CHINA |
| Email | : | mark@yantai-raffles.net |

**To the Shipyard: For Owner Furnished Equipment Notification**

| | | |
|---|---|---|
| Contact | : | Robin / Shi Wenhu / Jessica / Han Xiao Chen Customs Clearance Department |
| Address | : | Yantai Raffles Yard Co., Ltd No.70, Zhifu East Road, Yantai 264000, Shandong People's Republic of China |
| Tel | : | 0086 535 6828391 |
| Fax | : | 0086 535 6801260 |
| Email | : | wenhui@yantai-raffles.net ; xiaochen@yantai-raffles.net |

## 2.    Language

Any and all written notices and communications in connection with the Contract shall be in the English language.

## ARTICLE XVIII - CANCELLATION

Cancellation of this Contract for any reason shall not release either Party from any obligation that may have accrued before such cancellation, nor shall it preclude either party from exercising any remedies it might have in law or equity to enforce such obligations.

## ARTICLE XIX - ENTIRE AGREEMENT

The Agreement contains the entire contract and understanding between the parties hereto and supersedes all prior negotiations, representations, undertakings and agreements on any subject matter of the Contract.

**ARTICLE XX - GOVERNING LAW, DISPUTE AND ARBITRATION**

**1    Law Applicable**

The Parties hereto agree that the validity, enforcement and interpretation of this Contract and of each Article and part hereof be governed by and interpreted in accordance with the Laws of England.

**2.    Proceedings**

Should any dispute of any nature arise in respect of this Shipbuilding Contract, its performance or interpretation which is not decided in accordance with Section XX below, such dispute shall be settled by arbitration in London, England in accordance with the rules of the London Maritime Arbitrators Association and otherwise in accordance with the provisions of the Laws of England. The Party who desires arbitration of any such dispute shall give written notice to the other Party. The notice shall state the name and address of the arbitrator whom it appoints and describe the specific nature of the particular dispute. Such notice shall be sent by registered air mail and shall be addressed in the manner set forth in Section Article XVII, and the other Party shall, within thirty (30) Days following the receipt of said notice, give written notice to the Party requesting the arbitration as to the name and address of the arbitrator whom it appoints, which notice shall be sent by registered air mail and shall be addressed in the manner set forth in Section Article XVII, provided that if the other Party should fail to so appoint its arbitrator, the arbitrator appointed by the Party desiring the arbitration may proceed with the arbitration hearing and issue an award. Otherwise the two arbitrators so chosen shall select a third arbitrator. The applicable law of England on all matters at issue shall apply. An award based upon the decision of the majority of the arbitrators or the sole arbitrator, as the case may be, may be entered in the appropriate court of any country having jurisdiction of either Party. The arbitrators shall also decide which Party, or the extent to which each Party, shall pay costs of arbitration. Unless and to the extent otherwise determined by the arbitrator(s), reference to arbitration shall not relieve the BUILDER of its obligation diligently to proceed with the completion of the Works, but the majority of the arbitrators or the sole arbitrator, as the case may be, shall decide the extent to which the Delivery Date shall be extended by virtue of the dispute having been referred to arbitration. Any arbitration award rendered in accordance with this Section Article XIX shall be final and binding upon the Parties thereto. The Parties hereto hereby expressly waive any right to appeal any such arbitration award.

**3.    Arbitration Relating to Technical Disputes**

(i)    The Parties agree to enter into a separate contract with to ABS to provide that ABS will serve as the technical expert (the "Technical Arbitrator") to decide Technical Disputes pursuant to Section XX. If ABS does not agree to enter into such a contract, the Parties agree to appoint a Technical Arbitrator from another Classification society that is mutually agreeable to both Parties. The Party bringing the Technical Dispute shall have the burden of proof with respect to such proceeding. The Technical Arbitrator shall clarify the Classification's role in this regard and confirm that the classification society has no conflicts of interest with respect to such a role.

(ii)    Notwithstanding anything to the contrary herein, the Parties hereto agree that in the event of any Technical Dispute, such Technical Dispute will be referred to the Technical Arbitrator, for review and resolution. The Parties expressly agree that the opinion of the Technical Arbitrator regarding any Technical Dispute submitted to it for resolution pursuant to this Article XIX shall be final and binding on the Parties hereto with no right of appeal and the Parties hereby irrevocably waive any right of appeal, arbitration or other legal process.

**4.    Notice of Award**

Notice of any award shall immediately be given in writing or by telex or fax, confirmed in writing, to the BUILDER and the BUYER.

## ARTICLE XXI - INTERPRETATION; MISCELLANEOUS

### 1.    Language; Originals

This Contract and the Specification have been prepared in the English language. This Contract has been executed in two (2) originals, by each Party hereto. The Parties hereto have initialed each of the Schedules and Exhibits attached to this Contract.

### 2.    Rights and Obligations of the Parties

Each of the Parties to this Contract shall have the rights and obligations set forth herein, and none of the Parties, unless expressly set forth herein, shall have the authority to exercise the rights of the other Parties to this Contract.

### 3.    Cancellation

Cancellation of this Contract for any reason shall not release either Party from any obligation that may have accrued before such cancellation, nor shall it preclude either Party from exercising any remedies it might have in law or equity to enforce such obligations.    The following provisions shall survive the cancellation of the Contract:  (a) Article XI clauses (1) and (2); (b) Article XII; (c) Article XIII; (d) Article XIV; (e) Article XV; and (f) Article XX

This Contract with its Appendices has been drawn up in two identical originals, one for each party.

IN WITNESS WHEREOF this Contract with hull number YRO-2006-193 has been entered into between the Parties on the.

12th date of JULY 2006.

SIGNED by                    )
Fernando Schahin (POA)       )

In the presence of:-

Witness's Signature

Name of Witness      ʰⱧⱫⱯⱲ ȾⱤɪⱯⱤ ⱦₒ₵ₕ₄ ₴ₒₗₙₛₐₗₙₒ

SIGNED by                    )
Brian Chang – YRS CHAIRMAN   )

In the presence of:-

Witness's Signature
Name of Witness      :     MARLI VAN LEEUWEN