UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

x

CIMC RAFFLES OFFSHORE (SINGAPORE) PTE.
LTD. AND YANTAI CIMC RAFFLES
OFFSHORE LIMITED,

Petitioners,

v.

BAERFIELD DRILLING LLC,

Respondent.

13 Civ. 4932 (JSR)

CIMC RAFFLES OFFSHORE (SINGAPORE) PTE.
LTD. AND YANTAI CIMC RAFFLES
OFFSHORE LIMITED,

Petitioners,

v.

SORATU DRILLING LLC,

Respondent.

13 Civ. 4933 (JSR)

x

## MEMORANDUM OF LAW IN SUPPORT OF MOTION OF BAERFIELD DRILLING LLC AND SORATU DRILLING LLC TO DISMISS OR ALTERNATIVELY STAY PETITION TO CONFIRM A FOREIGN ARBITRATION AWARD AND FOR AN ENTRY OF JUDGMENT

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ............................................................................ iii

PRELIMINARY STATEMENT ......................................................................1

FACTS ...........................................................................................................2

A.   The UK Arbitrations ...........................................................................3

B.   Neither BDL nor SDL "Conduct Business" in New York.................6

C.   CIMC Has Previously Attempted to Recognize Foreign Judgments on an
     Expedited Basis That Have Subsequently Been Overturned ..............8

     1.   The UK Partial Summary Judgment Award ..............................8

     2.   CIMC's Failed Attempt to Recognize and Enforce the UK Partial Summary
          Judgment Award During the Foreign Appellate Process...........9

ARGUMENT .................................................................................................10

I.   NEITHER BDL NOR SDL ARE SUBJECT TO PERSONAL JURISDICTION
     IN NEW YORK ......................................................................................10

     A.   Personal Jurisdiction Over a Defendant Is Required Prior to
          Confirming a Foreign Arbitral Award ......................................10

     B.   The Presence of Certain BDL and SDL Project Accounts in New York Does
          Not Provide a Basis for Personal Jurisdiction in New York.....................11

          1.   Under New York Law Merely Maintaining a New York Bank Account Is
               Insufficient To Warrant A Grant of General Personal Jurisdiction..................11

          2.   B DL and SDL's Lack of Control Over The Project Accounts Precludes A
               Finding Of Personal Jurisdiction In New York ...............13

          3.   BDL and SDL Do Not Avail Themselves Of The Privilege Of "Doing
               Business" In New York Through The Project Accounts..................16

II.   CIMC'S APPLICATION FOR CONFIRMATION OF THE UK INTERIM AWARDS
      MUST BE DENIED BECAUSE THE UK AWARDS ARE NOT FINAL .....................17

      A.   The Interim Awards Petitioners Seek to Confirm Are Not Final Awards
           Appropriate For Confirmation Under The New York Convention......................18

i

B.    The UK Interim Awards Do Not Fall Within the Limited Exception to
The General Finality Requirement ........................................................................20

III.    EVEN IF THE COURT WERE INCLINED TO CONFIRM THE INTERIM
AWARDS, SUCH CONFIRMATION SHOULD BE STAYED UNTIL AFTER
RESOLUTION OF THE CHALLENGE CURRENTLY PENDING IN THE UK ..........22

CONCLUSION .......................................................................................................................24

# TABLE OF AUTHORITIES

## CASES

*Aero-Bocker Knitting Mills, Inc. v. Allied Fabrics Corp.*,
387 N.Y.S.2d 635 (1st Dept. 1976) ...........................................................................11

*Arroyo v. Mountain Sch.*,
892 N.Y.S.2d 74 (2009)..........................................................................................16

*Banco de Seguros del Estado v. Mut. Marine Offices, Inc.*,
230 F. Supp. 2d 362 (S.D.N.Y. 2002), *aff'd sub nom.*,
344 F.3d 255 (2d Cir. 2003).....................................................................................17

*Bank of Am. v. Whitney Cent. Nat'l Bank*,
261 U.S. 171, 43 S. Ct. 311 (1923)...........................................................................12

*Century Indem. Co. v. Certain Underwriters at Lloyd's London*,
11 Civ. 1040, 2012 WL 104773 (S.D.N.Y. Jan. 10, 2012)...........................................17

*Cf. MGM Prods. Group, Inc. v. Aeroflot Russian Airlines*,
573 F. Supp. 2d 772 (S.D.N.Y. May 14, 2003) ..........................................................24

*CIMC Raffles Offshore (Singapore) Pte. Ltd., et al. v. Schahin Holding S.A. et al.*,
13 Civ. 0052 (S.D.N.Y.) ..........................................................................................14

*Employers' Surplus Lines Ins. Co. v. Global Reinsurance Corp.-U.S. Branch*,
07 Civ. 2521, 2008 WL 337317 (S.D.N.Y. Feb. 6, 2008).....................................19, 20

*Europcar Italia, S.p.A. v. Maiellano Tours, Inc.*,
156 F.3d 310 (2d Cir. 1998).............................................................................22, 24

*Fluor Daniel Intercontinental, Inc. v. Gen. Elec. Co.*,
06 Civ. 3294, 2007 WL 766290 (S.D.N.Y. Mar. 13, 2007) ........................................20

*Fremay, Inc. v. Modern Plastic Mach. Corp.*,
222 N.Y.S.2d 694 (1961).........................................................................................12

*Frontera Res. Azerbaijan Corp. v. State Oil Co. of The Azerbaijan Republic*,
582 F.3d 393 (2d Cir. 2009)...............................................................................10, 11

*Greatship (India) Ltd. v. Marine Logistics Solutions (Marsol) LLC*,
11 Civ. 420, 2012 WL 204102 (S.D.N.Y. Jan. 24, 2012)............................................11

*Johnson v. Ward*,
829 N.E.2d 1201 (2005).........................................................................................13

*Landoil Res. Corp. v. Alexander & Alexander Servs., Inc.*,
918 F.2d 1039 (2d Cir. 1990)..............................................................................12

*Landoil Res. Corp. v. Alexander & Alexander Servs., Inc. et al.*,
565 N.E.2d 488 (1990)...............................................................................13, 16

*Metallgesellschaft A.G. v. M/V Capitan Constante*,
790 F.2d 280 (2d Cir. 1986)..................................................................18, 20, 22

*Michaels v. Mariforum Shipping, S.A.*,
624 F.2d 411 (2d Cir. 1980)............................................................17, 18, 20, 21

*Mitsubishi Heavy Indus., Ltd., v. Stone & Webster, Inc.*,
08 Civ. 0509, 2009 WL 3169973 (S.D.N.Y. 2009) ................................................18

*Nat'l Am. Corp. v. Fed. Republic of Nigeria*,
425 F. Supp. 1365 (S.D.N.Y. 1977)......................................................................13

*Nedagro B.V. v. Zao Konversbank*,
02 Civ. 3946, 2003 WL 151997 (S.D.N.Y. Jan. 21, 2003)...............................23, 24

*Nemetsky v. Banque De Developpement De La Republique Du Niger*,
401 N.E.2d 388 (2d Cir. 1979) ............................................................................12

*Netherlands Shipmortgage Corp., Ltd. v. Madias*,
717 F.2d 731 (2d Cir. 1983)................................................................................16

*Pearl Seas Cruises, LLC v. Irving Shipbuilding Inc.*, 10 Civ. 1294 , 2011 WL 577333 (D.
Conn. Feb 9, 2011)............................................................................................21

*Penn Collieries Co. v. McKeever*,
75 N.E. 935 (1905)............................................................................................16

*Private Sanitation Union Local 813, Int'l Bhd. of Teamsters v. V & J Rubbish Removal*,
89 Civ. 5945, 1990 WL 144207 (S.D.N.Y. 1990) ...........................................17, 18

*Rocket Jewelry Box, Inc. v. Noble Gift Packaging, Inc.*,
157 F.3d 174 (2d Cir. 1998)................................................................................18

*Schultz v. Safra Nat'l Bank of N.Y.*,
377 Fed. Appx. 101 (2d Circ. 2010) .....................................................................12

*Sinochem Int'l Co. Ltd. v. Malay. Int'l Shipping Corp.,*,
549 U.S. 422, 127 S.Ct. 1184 (2007)...................................................................11

*Sleigh Corp. v. Bureau Van Dijk*,
95 Civ. 3053, 1996 WL 219638 (S.D.N.Y. May 1, 1996).........................................................12

*Sonera Holding B.V. v. Cukurova Holding A.S*,
895 F. Supp. 2d 513 (S.D.N.Y. 2012)...........................................................................11

*Sterling Nat'l Bank & Trust Co. of N.Y. v. So. Scrap Export Co.*,
468 F. Supp. 1100 (S.D.N.Y. 1979)..............................................................................11

*United Rope Distrib., Inc. v. Kimberly Line*,
770 F. Supp. 128 (S.D.N.Y. 1991) ...............................................................................15

*United Trading Co. S.A. v. M.V. Sakura Reefer*,
95 Civ. 2846, 1996 WL 374154 (S.D.N.Y. July 2, 1996) .......................................14, 16

*World Film Servs., Inc. v. RAI Radiotelevisione Italiana S.p.A.*,
97 Civ. 8627, 1999 WL 47206 (S.D.N.Y. Feb. 3, 1999)..........................................15, 17

*Zeiler v. Deitsch*,
500 F.3d 157 (2d Cir. 2007)........................................................................................17

## STATUTES

Fed. R. Civ. P. 12(b)(1).....................................................................................................1

Fed. R. Civ. P. 12(b)(2).....................................................................................................1

Fed. R. Civ. P. 12(b)(6).....................................................................................................1

N.Y. Bus. Corp. Law § 304 ............................................................................................11

## MISCELLANEOUS

The Convention on the Recognition and Enforcement of Foreign Arbitral Awards, June 6,
1958.................................................................................................................................22

Respondents Baerfield Drilling LLC ("BDL") and Soratu Drilling LLC ("SDL") (collectively "Respondents") respectfully submit this memorandum in support of the Motion of Baerfield Drilling LLC and Soratu Drilling LLC to Dismiss or Alternatively Stay Petition to Confirm a Foreign Arbitration Award and for an Entry of Judgment filed by petitioners CIMC Raffles Offshore (Singapore) Pte. Ltd. and Yantai CIMC Raffles Offshore Ltd. (collectively "CIMC"), pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(2), and 12(b)(6).

## PRELIMINARY STATEMENT

This action should be dismissed for two independent reasons.  First, personal jurisdiction over the Respondents is lacking.  Respondents are Delaware corporations that conduct their business chartering drillships in Brazilian waters.  Petitioners' only basis for alleging personal jurisdiction over BDL and SDL are certain project accounts held in the name of the Respondents under the control of Deutsche Bank Trust Company Americas ("Deutsche Bank") as part of the Black Gold project financing structure, but which this Court has already held are not subject to the Respondents' control.  Under New York law, without any other indicia of jurisdiction demonstrated by Petitioners, these bank accounts, from which Respondents cannot withdraw or transfer funds, are insufficient to establish that the Respondents are "doing business," and hence subject to personal jurisdiction, in the state.  The Court of Appeals for the Second Circuit has repeatedly held that absent personal jurisdiction, a court may not grant recognition of a foreign arbitral award.

Second, as a long line of Second Circuit authority holds, a district court may not confirm an interim arbitral award issued in an ongoing proceeding, particularly one that does not fully and conclusively decide a separate and independent claim that cannot be set-off. That is what Petitioners impermissibly seek to do here; they seek recognition of interim awards granted

in ongoing arbitrations proceedings before the London Maritime Arbitrators Association that do not completely decide Petitioners' own claim, let alone any of Respondents' counterclaims.

Moreover, even if personal jurisdiction existed and the interim awards were eligible for this Court's review, the Court should stay confirmation until the Respondents' application in the English courts challenging the interim awards and seeking a stay is decided. Respondents were recently informed that the High Court of Justice, Queen's Bench Division, Commercial Court, in London, United Kingdom ("UK High Court") has granted a hearing on the stay application which is scheduled for November 8, 2013.  To avoid inconsistent judgments in the United Kingdom and New York, this Court should at minimum stay the petition to confirm the interim awards.

Accordingly, Respondents respectfully request that the Court dismiss Petitioners' petitions to confirm the interim awards for lack of personal jurisdiction and because as interim awards they are not reviewable by the Court.  Alternatively, Respondents respectfully request that the Court at a minimum exercise its discretion and stay the proceedings until Respondents' application to stay and challenge the interim awards has concluded.

## FACTS

The awards which CIMC seeks to enforce represent only partial determinations of the issues currently pending in two UK arbitrations, which themselves account for only two of the four proceedings between various members of the Schahin Group and CIMC.[1]  All of the

---

[1]    On May 3, 2012, CIMC commenced an arbitration proceeding in New York against Schahin Holding S.A. ("Schahin  Holding"), Schahin Engenharia S.A., Sea Biscuit International Inc., Black Gold Drilling LLC ("Black Gold"), Baerfield Drilling LLC ("BDL"), and Soratu Drilling LLC ("SDL") for amounts advanced under two separate Advance and Equity Conversion Agreements entered into in August 2010  ("ECAs"). On November 8, 2012, the tribunal awarded CIMC $69,470,777.  On March 13, 2013 and April 22, 2013, the United States District Court for the Southern District of New York entered judgment confirming those awards.  There is also another proceeding pending in the High Court of England and Wales between CIMC and Schahin Holding, S.A. based on a Deed of Guarantee and Indemnity that was entered into on December 18, 2009.

proceedings between the parties, however, can be traced back to a series of fraudulent representations made by CIMC which induced BDL and SDL each to enter into a shipbuilding contract for the construction of a semi-submersible drilling vessel (the "Shipbuilding Contracts"), which CIMC did not have the technical know-how or capacity to properly and timely deliver, causing BDL and SDL to suffer significant damages, currently estimated at $360 million.

## A.     The UK Arbitrations

After Petroleo Brasileiro S.A. ("Petrobras"), the Brazilian multinational energy company, accepted Schahin's bid for the charter and operation of two semi-submersible drilling vessels, BDL and SDL initiated discussions with five different shipyards for the construction of the vessels.  (August 7, 2013 Declaration of Fernando Schahin ("Schahin Dec'l."), ¶ 3,4).  After several meetings in Houston, Texas and in Yantai, China, BDL and SDL ultimately selected CIMC to construct the two vessels.  (Schahin Dec'l. ¶ 5,6).  During these discussions, CIMC represented that it had complete, state of the art facilities, a team of capable and experienced individuals, advanced software which would expedite construction, the know-how to appropriately apply that software, and all the resources necessary to complete projects of such magnitude and complexity.  (Schahin Dec'l. ¶ 6).  In July 2006, BDL and SDL each signed their respective shipbuilding contract with CIMC, pursuant to which CIMC was required to construct the SS Amazonia and the SS Pantanal.  (Schahin Dec'l. ¶ 7).  In order to minimize the risk of late delivery of the vessels (which would include penalties and potential termination of its contracts

with Petrobras), BDL and SDL negotiated an express provision stating that "[t]ime is of the essence in the construction of the Vessel[s]."[2]  (Schahin Dec'l. ¶ 8).

Once construction of the vessels began, it became apparent that CIMC had grossly misrepresented its capabilities.  (Schahin Dec'l. ¶ 9).  The reality was that CIMC's shipyard was overbooked and chronically understaffed, and it lacked the necessary capacity and experienced personnel to construct the vessels.  *Id.*  Moreover, CIMC did not have previous experience with the design software it had touted to BDL and SDL.  *Id.*  As a result, construction of the vessels grew increasingly delayed.  (Schahin Dec'l. ¶ 10).  Due to the lack of available space at its own shipyard, CIMC made arrangements for a substantial portion of the construction of the drilling rigs to be carried out at two shipyards in Dalian and Haiyang, causing still further delays.  *Id.*  The SS Pantanal and SS Amazonia were not delivered until November 15, 2010 and April 25, 2011, respectively, more than one and two years beyond the respective delivery deadline, causing BDL and SDL to incur significant penalties under their agreements with Petrobras.  (Schahin Dec'l. ¶ 12).  Furthermore, the vessels were delivered incomplete, resulting in an additional eight-month delay for the SS Amazonia and four-month delay for the SS Pantanal, during which time BDL and SDL had to expend further millions of dollars to hire third parties to complete the vessels.  (Schahin Dec'l. ¶ 13).

In December 2011, CIMC commenced two arbitrations in London against BDL and SDL (the "UK Arbitrations"), seeking $43.7 million plus interest, which they claimed was for unpaid portions of the vessels' purchase price and other sums allegedly due under the Shipbuilding Contracts.  (Schahin Dec'l. ¶ 14).  BDL and SDL cross-claimed for damages totaling $360 million, based on CIMC's misrepresentations, deceit, and breach of contract.  *Id.*

---

[2]     The vessels were originally scheduled for delivery on two separate dates in 2009.  However, after construction of the vessels had begun, BDL and SDL each paid $6,000,000 for amendments to the Shipbuilding Contracts that accelerated the delivery dates for each.

As a result of CIMC's substantial defaults under the Shipbuilding Contracts, BDL and SDL do not believe they are liable for any unpaid amounts, since the damages caused by CIMC far exceed the amounts claimed by CIMC. *Id.*

A hearing to determine several *preliminary* issues took place on February 11 and February 12, 2013. In considering these issues, the tribunal relied on oral arguments and witness statements, but was unable to consider any of the hundreds of thousands of documents to be exchanged as part of an ongoing disclosure exercise.[3] (*See* Schahin Dec'l. ¶ 18). On June 12, 2013, the tribunal released its Interim Arbitration Final Awards determining some of these preliminary issues, and reserving the remaining issues for later determination. Moodhe Dec'l Ex. 1. The tribunal determined that BDL and SDL were not entitled to set-off *under the Shipbuilding Contracts*, but did not make a determination regarding set-off under the Security Assignment Agreement or equitable set-off. *Id.* As such, the interim awards require BDL to make a partial payment of $11,030,316.80 plus interest and SDL to make a partial payment of $4,943,513.52 plus interest, representing the deferred purchase price under BDL's shipbuilding contract, and change orders under both contracts. *Id.*

On June 21, 2013, BDL and SDL filed an application to the UK High Court under Section 68 of the Arbitration Act 1996 to challenge the interim awards "on the ground of serious irregularity affecting the tribunal, the proceedings and the Awards". (Schahin Dec'l. Ex. D at ¶ 20). BDL and SDL also requested an order that enforcement of the approximately $16 million plus interest partial awards be stayed pending the determination of the application to the UK

---

[3]    The parties were originally scheduled to exchange their disclosure on July 5, 2013, and BDL and SDL were prepared to do so. However, as the deadline approached, it became apparent that CIMC was not prepared to complete their review obligations by this date, so it was initially postponed to August 2, 2013. The Petitioners have since sought to further postpone the date, and the Respondents await confirmation from the Petitioners as to when they will be in a position to exchange disclosure.

High Court.  *Id*.  The hearing for that stay application has now been scheduled for November 8, 2013.

BDL and SDL have asserted to the UK High Court that under the Shipbuilding Contracts they are entitled to set off any unpaid amounts against their significant counterclaims, and alternatively that they have a clear right of set-off under the Security Agreement, an agreement separate and distinct from the Shipbuilding Contracts.  *Id*.  The merits of this appeal is conveyed in Lars Thomas Lidstrom's witness statement accompanying the appeal, which states that "[BDL and SDL] are bound to succeed on the section 68 application, or in the least, they have a strong case.  (Schahin Dec'l. Ex. E at ¶ 21).  As a result, it would be contrary to principles of fairness and the overriding objective for [BDL and SDL] to have to make the payment . . . " *Id.* at ¶ 33.1.

A full merits hearing will commence in March 2014 to address both the outstanding amounts claimed by CIMC (US $27,771,933 plus interest), and all of BDL's and SDL's counterclaims.  (Schahin Dec'l. ¶ 22).

**B.      Neither BDL nor SDL "Conduct Business" in New  York**

BDL and SDL, the parties to the Shipbuilding Contracts, have only a minor, fortuitous contact with New York.  Both entities are special purpose vehicles, incorporated in Delaware, which were formed for the sole purpose of owning, managing, and operating the SS Amazonia and the SS Pantanal, respectively.  (Schahin Dec'l. ¶ 2).  These entities do not have an office or employees in New York, do not conduct or solicit any business in New York, and do not have any other presence in New York.  *Id.*  Rather, these entities' entire business operations have been conducted in Brazilian waters.  *Id.*

From their inception, BDL's and SDL's activities have been conducted elsewhere.  The Shipbuilding Contracts with CIMC, which are governed by English law and

6

specify that all disputes will be settled by arbitration in London, related to the construction of vessels that took place entirely in three cities in Asia: Yantai, Dalian, and Haiyang.  (Schahin Dec'l. ¶ 5, 10).  All of BDL's and SDL's revenue is derived from the charter and operation of these vessels under two charter and service agreements with Petrobras, which identify Rio de Janeiro as the appropriate venue for any disputes.  (Schahin Dec'l. ¶ 23).  Furthermore, these vessels are only used to conduct deep water drilling operations off the coast of Brazil.  (Schahin Dec'l. ¶ 3).

        These entities' only contact with New York consists of a subset of project accounts held at Deutsche Bank.[4]  (Schahin Dec'l. ¶ 24, 25).  Each of these project accounts has a specific payment purpose, such as for interest payments, principal payments, payment of operation and maintenance expenses (including but not limited to payroll, insurance costs, government fees, and professional fees), capital expenditures, and the funding of reserve amounts.  (Schahin Dec'l. ¶ 25).  These project accounts were established to provide security for an international consortium of lenders who provided the project financing to Black Gold Drilling LLC ("Black Gold").[5]  *Id.*  An administrative agent, not BDL or SDL, has sole control over the project accounts, and ensures that each month, funds flow through the various project accounts as specified in the financing documents.  *Id.*  This Court has already recognized that BDL and SDL do not have control over these accounts.  Order ("April 30 Order"), CIMC Raffles Offshore (Singapore) Pte. Ltd., et al. v. Schahin Holding S.A., et al., 13 Civ. 0052 (S.D.N.Y.) (Apr. 30, 2013), D.I. No. 56 at 7 ("Here, even though the offshore project accounts are established in BDL's, SDL's and/or Black Gold's names, only Portigon and Deutsche Bank, as agents for the

---

[4]    In total, there are forty-two accounts for the Black Gold project.  These are held at either Deutsche Bank or Deutsche Bank S.A.- Banco Alemao (a separate and distinct Brazilian entity), and in addition to BDL and SDL, various of these accounts are also held in the name of Schahin Engenharia S.A. and Black Gold.

[5]    Black Gold is BDL's and SDL's parent company; it is also incorporated in Delaware.

senior lenders, can exercise control [over] the withdrawal and transfer of funds under the terms of the contractual waterfalls.").

### C.   CIMC Has Previously Attempted to Recognize Foreign Judgments on an Expedited Basis That Have Subsequently Been Overturned

Perhaps not surprisingly given the global nature and complexity of the disputes between the parties spanning multiple proceedings (much of which is omitted here), this is not the first instance in which a partial award has been rendered that CIMC has sought to recognize and enforce in New York.  CIMC's attempt to recognize and enforce a prior award, and the UK Court of Appeal's ultimate reversal of that award, is instructive here.

#### 1.   The UK Partial Summary Judgment Award

Due to CIMC's construction delays, attendant payments due under the Shipbuilding Contracts also had to be delayed, many of which were deferred until after delivery of the vessels.  (Schahin Dec'l. Ex. A at 13).  The project financing lenders were concerned that this could threaten their interests in the project assets, and thus required a new entity, Schahin Holding S.A. ("Schahin Holding") to enter into a Deed of Guarantee and Indemnity with CIMC on December 18, 2009, to guarantee these deferred payments.  *Id.*  On December 23, 2011, CIMC commenced proceedings in the UK High Court for $98,549,325.41 plus interest, representing deferred payments under the Shipbuilding Contracts.  On February 17, 2012, CIMC then moved for summary judgment, and on May 21, 2012, the UK High Court granted CIMC partial summary judgment against Schahin Holding, in the amount of $53,353,750.70.  On August 8, 2012, the UK Court of Appeal granted Schahin Holding permission to appeal the partial summary judgment decision, and an appeal date was set for January 14, 2013.  Letter, CIMC Raffles Offshore (Singapore) Limited et al. v. Schahin Holdings S.A. et al., No. 650850/2012 (N.Y. Sup. Ct), D.I. No. 132.  As explained in further detail below, as a result of

that appeal, the order for partial summary judgment was set aside in a judgment dated June 7, 2013.  (Schahin Dec'l. ¶ 7).

### 2.    CIMC's Failed Attempt to Recognize and Enforce The UK Partial Summary Judgment During the Foreign Appellate Process

On July 19, 2012, CIMC filed a Cross-Motion for Partial Summary Judgment to Recognize and Enforce the UK Final Judgment, and for Leave to Amend, and in Opposition to Defendants' Motion to Dismiss before Honorable Justice Kapnick, New York County State Supreme Court, Commercial Division.  Notice of Motion, *CIMC Raffles Offshore (Singapore) Limited et al. v. Schahin Holdings S.A. et al.*, No. 650850/2012 (N.Y. Sup. Ct), D.I. No. 113. This motion was dismissed on November 14, 2012 because CIMC had improperly brought its motion in a pending special proceeding, rather than in a separate action as required by CPLR 103(b).  *Id.*, D.I. No. 2.   CIMC then filed a second summary judgment motion to confirm the foreign award, and proceedings were held before Honorable Justice Coin, New York State Supreme Court.  Motion, *CIMC Raffles Offshore (Singapore) Limited et al. v. Schahin Holdings S.A. et al.*, No. 158621/2012 (N.Y. Sup. Ct), D.I. No. 2. Schahin Holding made a limited appearance to oppose CIMC's motion based on improper service and lack of personal jurisdiction. *Id.*, D.I. No. 18.   Additionally, and paralleling BDL's and SDL's position in the instant proceeding, Schahin Holding argued that the Court should stay CIMC's summary judgment motion because it was premature, since Schahin Holding had filed an appeal that was pending before the UK Court of Appeal.  *Id.*  In pressing for confirmation, CIMC attempted to assure the Court that the partial summary judgment would not be reversed, arguing that "Schahin Holding's appeal is frivolous both as a matter of fact, and as a matter of law."  Affirmation, *CIMC Raffles Offshore (Singapore) Limited et al. v. Schahin Holdings S.A. et al.*, No. 158621/2012 (N.Y. Sup. Ct), D.I. No. 2 ¶ 29).  Contrary to CIMC's assertions, on June 7, 2013,

the UK Court of Appeal unanimously set aside the partial summary judgment, explaining that ". . . this is not a case in which the baby can safely be ordered to be cut in half" and that "the various questions of construction . . . or the closely allied questions of the purview of the guarantee, will have to be considered as a whole . . . at trial."  (Schahin Dec'l. Ex. F at ¶ 27).  Judge Coin dismissed the recognition proceedings shortly thereafter before issuing a decision on CIMC's motion, which was *sub judice*.  (Schahin Dec'l. ¶ 27).

## ARGUMENT

## I.    NEITHER BDL NOR SDL ARE SUBJECT TO PERSONAL JURISDICTION IN NEW YORK

To confirm the interim awards, Petitioners must demonstrate that Respondents are subject to either general jurisdiction in New York or the New York long-arm statute.  Petitioners assert that bank accounts in New York held under the names of Respondents as part of the Black Gold project financing structure are sufficient to constitute a submission to general jurisdiction in the state.  July 26, 2013 Memorandums of Law in Support of Petition to Confirm a Foreign Arbitration Award and for an Entry of Judgment ("CIMC Pleading") at 2.  However, under New York law the mere presence of bank accounts does not equate to "doing business" in the state. The project accounts, over which the Respondents have no control, were created to provide security to the lenders and not to take advantage of doing business in New York.  Consequently, this Court should dismiss Petitioners' petition for lack of personal jurisdiction.

### A.    Personal Jurisdiction Over A Defendant Is Required Prior to Confirming a Foreign Arbitral Award

The Second Circuit has consistently held that personal jurisdiction over a defendant is required in order to confirm a foreign arbitral award under the New York Convention, stating that jurisdiction over a defendant's person or property is "a prerequisite to the enforcement of [Plaintiff's] petition."  *Frontera Res. Azerbaijan Corp. v. State Oil Co. of The*

*Azerbaijan Republic*, 582 F.3d 393, 398 (2d Cir. 2009).  In *Frontera*, the Second Circuit held

that the defenses enumerated in Article V of the New York Convention for refusing confirmation

did not limit or "alter the fundamental requirement of jurisdiction over the party against whom

enforcement is being sought."  *Id.* at 397.  The court went on to hold that due to the primacy of

jurisdiction, which requires that "jurisdictional questions ordinarily must precede merits

determination," the district court did not err in requiring some basis of personal jurisdiction prior

to confirming the foreign arbitral award. *Id*. (*quoting Sinochem Int'l Co. Ltd. v. Malay. Int'l

Shipping Corp.*, 549 U.S. 422, 431, 127 S.Ct. 1184, 1191 (2007)).  Since the Second Circuit's

ruling in *Frontera*, this Court has consistently required some basis for personal jurisdiction prior

to confirming a foreign arbitral award.  *See, e.g., Greatship (India) Ltd. v. Marine Logistics

Solutions (Marsol) LLC*, 11 Civ. 420, 2012 WL 204102 (S.D.N.Y. Jan. 24, 2012); *Sonera

Holding B.V. v. Cukurova Holding A.S*, 895 F.Supp.2d 513, 518 (S.D.N.Y. 2012) *motion for

relief from judgment denied*, 11 Civ. 8909, 2012 WL 6644636 (S.D.N.Y. Dec. 21, 2012).

**B.     The Presence Of Certain BDL And SDL Project Accounts In New York Does
Not Provide A Basis for Personal Jurisdiction In New York**

**1.     Under New York Law Merely Maintaining a New York Bank Account
Is Insufficient To Warrant A Grant of General Personal Jurisdiction**

In their pleadings, Petitioners argue that BDL and SDL are subject to general

jurisdiction in New York under the "doing business" standard.[6]  CIMC Pleading at 2.  This

assertion is based entirely upon the presence of certain BDL and SDL project finance accounts

---

[6]     Petitioners do not assert, nor can they assert, that BDL or SDL have consented to general personal
jurisdiction in New York.  BDL and SDL are incorporated in Delaware and are not registered as authorized
foreign corporations with the New York Secretary of State.  *See* N.Y. Bus. Corp. Law § 304.  In addition,
Respondents have not consented to New York jurisdiction in the Shipbuilding Contracts that underlie the
UK Arbitrations.  (Moodhe Dec'l. Art. XX)  Respondents' agreement to arbitrate the ECAs' dispute in
New York is not a broad submission to jurisdiction in New York, but instead constitutes only consent to the
Court's jurisdiction with regards to the New York arbitration of the ECAs alone and not as to any other
disputes arising between the parties.  *See Sterling Nat'l Bank & Trust Co. of N.Y. v. So. Scrap Export Co.*,
468 F.Supp. 1100 (S.D.N.Y. 1979); *Aero-Bocker Knitting Mills, Inc. v. Allied Fabrics Corp.*, 387 N.Y.S.2d
635 (1st Dept. 1976).

held by Deutsche Bank Trust Company Americas in New York, which Petitioners allege are used to service debts and to make unspecified operational and maintenance expenses.  CIMC Pleading at 3.  This Court has held that a plaintiff has the burden of proving that a defendant meets the "doing business" standard; that is, that it continuously and systematically conducts business in New York.  *See Sleigh Corp. v. Bureau Van Dijk*, 95 Civ. 3053, 1996 WL 219638 (S.D.N.Y. May 1, 1996).  As a matter of New York law, the presence of BDL and SDL project finance accounts in New York does not constitute "doing business" in New York and as a result this case must be dismissed for lack of personal jurisdiction.

The general rule under New York law is that the presence of bank accounts in New York is not enough to constitute doing business in the state.  *See e.g., Nemetsky v. Banque De Developpement De La Republique Du Niger*, 401 N.E.2d 388 (2d Cir.1979) (holding that the existence of a banking relationship between defendant and a bank in New York was not sufficient to support the "doing business" standard); *Fremay, Inc. v. Modern Plastic Mach. Corp.*, 222 N.Y.S.2d 694, 700 (1961) (finding that defendant's bank account in New York in conjunction with a number of other factors was not sufficient to show that the corporation was doing business within the state).  In *Bank of Am. v. Whitney Cent. Nat'l Bank*, 261 U.S. 171, 43 S.Ct. 311 (1923) (cited with approval by the Court of Appeals for the Second Circuit in *Landoil Res. Corp. v. Alexander & Alexander Servs., Inc.*, 918 F.2d 1039 (2d Cir. 1990)), the Supreme Court held that a Louisiana bank was not doing business in New York despite its affiliation with six independent New York banks, each of which held "an active, regular deposit account" for the defendant.  *Id.* at 173.

The sole case cited by Petitioners does not support their assertion that the presence of bank accounts alone qualifies as "doing business" in New York.  In *Schultz v. Safra*

*Nat'l Bank of N.Y.*, 377 Fed. Appx. 101, 103 (2d Cir. 2010), the Court analyzed an amalgamation of factors and held that personal jurisdiction did not exist because the defendant had engaged in solicitation alone and did not have, for example, a bank account in New York.  Like in *Schultz*, BDL and SDL do not have an office in New York, do not solicit business in the state, and have no real or personal property in New York, and like *Schultz* this lack of any indicia of general jurisdiction obviates a finding of "doing business" in New York.  *See also Nat'l Am. Corp. v. Fed. Republic of Nigeria*, 425 F.Supp. 1365, 1369 (S.D.N.Y. 1977).[7]

### 2.    BDL's and SDL's Lack Of Control Over The Project Accounts Precludes A Finding Of Personal Jurisdiction In New York

Even if Respondents' maintenance of bank accounts in New York would otherwise qualify as "doing business," the Respondents' lack of control of these accounts demonstrates that they are in fact not "doing business" in this state.  In *Landoil Res. Corp. v. Alexander & Alexander Servs., Inc. et al.,* 565 N.E.2d 488 (1990), the plaintiff alleged that a third-party, Syndicate 317, was "doing business" in New York based upon the presence of a trust fund in New York where Syndicate 317 deposited funds as part of its underwriting activities.  In determining that the bank accounts were not sufficient to sustain general jurisdiction, the court concluded that "funds cannot be withdrawn from or deposited into the account by Syndicate 317 and it is not administered by Syndicate 317."  *Id.* at 491.  Moreover, the Court held that even if Syndicate 317 did maintain the account "that alone does not establish . . . a continuous and systematic basis" for doing business, as per the general rule under New York law.  *Id.  Landoil Resources* has been cited by this Court for the proposition that "where [a] defendant [can] neither

---

[7]    The New York project accounts do not provide a basis for specific jurisdiction either, as these accounts are wholly unrelated to the Shipbuilding Contracts signed between Schahin and CIMC that underlies the UK interim award.  *See Johnson v. Ward*, 829 N.E.2d 1201, 1202 (N.Y. 2005) (holding that to qualify for specific jurisdiction under the New York long-arm statute there must exist a "substantial relationship" between the cause of action and the New York transaction).

deposit nor withdraw money," the presence of a local bank account cannot amount to "doing business" in New York. *See United Trading Co. S.A. v. M.V. Sakura Reefer*, 95 Civ. 2846 , 1996 WL 374154 (S.D.N.Y. July 2, 1996) (holding that the defendant's agent in New York had no rights of deposit or withdrawal against the account and thus there was an insufficient basis for the Court to exercise personal jurisdiction over the defendant).

BDL and SDL cannot "assign or transfer" any funds in the New York project accounts, and "only Portigon and Deutsche Bank, as agents for the senior lenders, can exercise control" over these accounts, as this Court determined in its April 30 Order in the case *CIMC Raffles Offshore (Singapore) Pte. Ltd., et al. v. Schahin Holding S.A., et al.*, 13 Civ. 0052 (S.D.N.Y.) (Rakoff, J.). April 30 Order at 7; *see also* Order ("August 6 Order"), CIMC Raffles Offshore (Singapore) Pte. Ltd., et al. v. Schahin Holding S.A., et al., 13 Civ. 0052 (S.D.N.Y.) (Apr. 30, 2013), D.I. No. 87 at 4. Out of the forty-two project accounts, only six are held in the name of BDL and only six are held in the name of SDL in New York. (Brenner Dec'l. Ex. A § 2.02(b)-(c)).[8] As stated in the Collateral Agreement governing the accounts, all funds in the Offshore Project Accounts are "held in the sole custody and control of the Collateral Agent." *Id.* § 2.02(a). As demonstrated to this Court previously, Petrobras automatically deposits payments from the charter and services agreements into the project accounts. (Brenner Dec'l ¶¶ 10, 14). Deutsche Bank, along with administrative agent Portigon A.G., controls the funds in the project accounts and disburses principal and interest payments to the Black Gold project lenders and operating expenses to a Schahin entity that is not the Respondents, the latter paid from two

---

[8]     Citations to the "Brenner Dec'l" refer to the affidavit of Jared Brenner submitted in support of Portigon AG's Motion for Relief from Petitioners' Enforcement Actions and Limited Opposition to Petitioenrs' Motion for Post-Judgment Enforcement Pursuant to Fed. R. Civ. P. 69, in the case *CIMC Raffles Offshore (Singapore) Pte. Ltd., et al. v. Schahin Holding S.A., et al.*, 13 Civ. 0052 (S.D.N.Y.) (Rakoff, J.), docket number 37. Due to the size of this declaration (thirteen exhibits) Respondents have incorporated this declaration by reference, but will upload it in its entirety to this case should the Court request such action be taken.

project accounts held in the name of Black Gold (although called the BDL and SDL Offshore

Operating accounts, these accounts are held by Black Gold).  *See* Brenner Dec'l ¶¶ 16, 20

("While the Offshore Project Accounts are established in [Black Gold] or [BDL's or SDL's]

name[s], none of those parties are able to assign or transfer funds from those accounts"); August

6 Order at 4 ("[BDL and SDL] have no authority to vary payments from those laid out in the

underlying contractual agreements."); *see also* (Brenner Dec'l Ex. 1 §§ 4.07(c), 4.08, and 4.09).

The Withdrawal Certificates necessary to initiate the offshore waterfalls are submitted by Black

Gold and Schahin Engenharia, not BDL or SDL.  (Schahin Dec'l. ¶ 25).  Lastly, no funds from

any of these forty-two accounts flow unencumbered to either BDL or SDL at any step in the

monthly waterfall.  *Id.*

       This is in sharp contrast to *United Rope Distrib., Inc. v. Kimberly Line*, 770 F.

Supp. 128, 133 (S.D.N.Y. 1991) *adhered to on reconsideration*, 785 F.Supp. 446 (S.D.N.Y.

1992), where the court found that the defendant had "control over its money held . . . in New

York," paid expenses from the account, contacted the bank to have funds quickly transferred,

and in fact referred to the account's managing agent as "the 'owner's New York agent'."  785

F.Supp. at 450.  On that basis, and after finding several other indicia of general jurisdiction, the

*United Rope* court found that the defendant was "doing business" in New York.  *Id.* (finding that

defendant was "doing business" in New York after concluding that the New York broker

negotiated the charter in New York and that the mortgage was recorded in New York).

       This distinction between *Landoil* and *United Rope* was recognized by this Court

in *United Trading*, where this Court held that since the defendant and defendant's agent had

"little control" and no rights of deposit or withdrawal, the "millions of dollars in charter hire"

deposited in the New York bank did not support a finding by itself of "doing business" in New

York.  *See United Trading* at 2; *see also World Film Servs., Inc. v. RAI Radiotelevisione Italiana S.p.A.*, 97 Civ. 8627, 1999 WL 47206 (S.D.N.Y. Feb. 3, 1999) (holding that bank account which was used solely to pay creditors who contracted to receive payment in U.S. dollars did not constitute sufficient activity to constitute "doing business").  Consequently, since neither BDL nor SDL can deposit, withdraw, or transfer sums from the New York project accounts, under New York law these accounts do not constitute a basis for finding that BDL or SDL do business in New York.

### 3.   BDL And SDL Do Not Avail Themselves Of The Privilege Of "Doing Business" In New York Through The Project Accounts

The project accounts were not created to allow Respondents to avail themselves of the privilege of conducting business in New York.  The "doing business" standard for general jurisdiction requires that a corporation intend to "avail itself of the privilege to carry on a business" in this state.  *See Netherlands Shipmortgage Corp., Ltd. v. Madias*, 717 F.2d 731, 739 (2d Cir. 1983) (*quoting Penn Collieries Co. v. McKeever*, 75 N.E. 935, 936 (1905)).  The bank accounts are incidental to Respondents' business, which is chartering the S.S. Amazonia and the S.S. Pantanal in Brazilian waters.  *Arroyo v. Mountain Sch.*, 892 N.Y.S.2d 74, 76 (2009) (holding that out-of-state school was not doing business in New York based on maintenance of bank account here, because the bank account in New York was incidental to defendant's business of educating students in Massachusetts).

Without the lenders' requirement in the Collateral Agency and Security Deposit Agreement to set up the projects accounts in the name of BDL and SDL, respectively, it is unlikely that the Respondents as Delaware entities chartering ships in Brazilian waters would have opened New York bank accounts under the sole control of a third-party, Deutsche Bank.  *See Landoil*, 565 N.E.2d at 491 (finding that the trust fund was not maintained for the purpose of

16

allowing Syndicate 317 to take advantage of the New York insurance market and holding, partly

based on this, that Syndicate 317 was not "doing business" in New York); *World Film Servs.,*

*Inc.* (holding that defendant's maintenance of a bank account in New York to pay its creditors

was not an activity intended to take advantage of "doing business" in New York).  The accounts

were created in New York to provide security to the lenders, ensuring that the lenders have

control over any deposits made by Petrobras, and that BDL, SDL, and their parent Black Gold

meet their financial obligations.  (Schahin Dec'l. ¶ 24)

Therefore, the mere existence of Respondents' project accounts created to provide

security to the project lenders and over which Respondents have no control, does not constitute

the necessary "continuous, permanent, and substantial" contacts necessary to qualify as "doing

business" in New York.

## II.    CIMC'S APPLICATION FOR CONFIRMATION OF THE UK INTERIM AWARDS MUST BE DENIED BECAUSE THE UK AWARDS ARE NOT FINAL

A district court only has the power to confirm a *final* arbitration award.  *Michaels*

*V. Mariforum Shipping, S.A.*, 624 F.2d 411, 414 (2d Cir. 1980) (stating that "[i]n order to be

'final,' an arbitration award must be intended by the arbitrators to be their complete

determination of all claims submitted to them"); *Private Sanitation Union Local 813, Int'l Bhd.*

*of Teamsters v. V & J Rubbish Removal,* 89 Civ. 5945, 1990 WL 144207 at *2 (S.D.N.Y. 1990)

(holding that "[a]n arbitral award . . . is not enforceable if it is not final.").[9]  This requirement

---

[9]    In determining issues of finality for purposes of recognition of partial awards, courts in the Second Circuit have interchangeably referred to cases arising under the New York Convention and the Federal Arbitration Act (FAA). *See, e.g., Century Indem. Co. v. Certain Underwriters at Lloyd's London*, 11 Civ. 1040 , 2012 WL 104773 (S.D.N.Y. Jan. 10, 2012) (applying Second Circuit precedent from domestic arbitration cases under the FAA to a New York Convention award to determine finality of an interim award); *Zeiler v. Deitsch*, 500 F.3d 157, 169 (2d Cir. 2007) (same); *Banco de Seguros del Estado v. Mut. Marine Offices, Inc.*, 230 F. Supp. 2d 362, 368 (S.D.N.Y. 2002) *aff'd sub nom. Banco de Seguros del Estado v. Mut. Marine Office, Inc.*, 344 F.3d 255 (2d Cir. 2003) (stating that an interim award for prejudgment security under the Inter-American Convention was confirmable and "an appropriate analogy may be made, however, to the [FAA], which only permits a federal court to confirm or vacate an arbitration award that is 'final'.").

furthers important policy considerations, since applications for interlocutory relief "result only in a waste of time . . . and delaying tactics in a proceeding that is supposed to produce a speedy decision."[10]  *Michaels*, 624 F.2d at 414.  Courts have recognized a limited exception to this general rule where arbitrators fully dispose of a separate and independent claim that is not subject to abatement or set-off.  *Metallgesellschaft A.G. v. M/V Capitan Constante*, 790 F.2d 280, 283 (2d Cir. 1986).  Because the tribunal has not reached a final determination on all issues presented in the UK Arbitrations, the awards are not final and therefore are not justiciable by this Court.  Furthermore, because the tribunal has not fully disposed of a singular, separate and independent claim that is not subject to set-off, the interim UK awards do not fall within the limited exception and this Court should dismiss Petitioners' petitions.

### A.    The Interim Awards Petitioners Seek To Confirm Are Not Final Awards Appropriate For Confirmation Under The New York Convention

An arbitration award is considered "final" only if the award constitutes a "complete determination of all claims submitted to [the tribunal]" for arbitration.  *Michaels*, 624 F.2d at 413; *Private Sanitation Union*, 1990 WL 144207 at 2.; s*ee also Rocket Jewelry Box, Inc. v. Noble Gift Packaging, Inc.*, 157 F.3d 174, 177 (2d Cir. 1998) *(*holding that an arbitration award is "final if it 'resolve[s] all issues submitted to arbitration, and determine[s] each issue fully so that no further litigation is necessary to finalize the obligations of the parties.'").  Furthermore, in determining whether an interim award is "final," courts will disregard the tribunal's own characterization of its award as "final."  *See Mitsubishi*, 2009 WL 3169973 at *6 ("It is of no effect that the tribunal now considers its . . . award to be final and certain as to liability; what matters is whether the tribunal finally resolved the issue so that it does 'not stand

---

[10]    As described in footnote 3, *supra*, Petitioners have already delayed the UK arbitrations proceedings by ignoring the disclosure deadlines imposed by the tribunal.

in need of further adjudication.'"); *Employers' Surplus Lines Ins. Co. v. Global Reinsurance Corp.-U.S. Branch*, 07 Civ. 2521, 2008 WL 337317 at *8 (S.D.N.Y. Feb. 6, 2008) (". . . irrespective of the arbitrator's intent, the partial award must resolve issues definitely enough so that the rights and obligations of the two parties . . . do not stand in need of further adjudication . . . ").

   The interim awards in no way constitute a "complete determination of all claims submitted" to the tribunal, both because they do not fully dispose of Petitioners' claim for breach of contract and because they do not yet reach the merits of Respondents' claims.  (Moodhe Dec'l Ex. 1 at 3-4.)  The tribunal decided a number of preliminary issues such as: whether a portion of Petitioners' claim in the arbitrations are payable by Respondents; whether these payments are subject to limited set-off under the shipbuilding contracts; whether Respondents' counterclaims were excluded under the liquidated damages provision; and, whether the incomplete delivery counterclaims were excluded by the delivery documents.  With respect to the Petitioners' breach of contract claim, the tribunal ordered damages against BDL in the sum of $11,030,316.80 (covering the deferred portions of the Contract Price and sums in respect of undisputed Change Orders) and against SDL in the sum of $4,943,513.52 (sums in respect of undisputed Change Orders), but it did not fully dispose of CIMC's contractual claim.  (Moodhe Dec'l Ex. 1 at 9.)  With respect to the Respondents' counterclaims, they have yet to be adjudicated at all on the merits.  *Id.*  Specifically, the tribunal expressly reserved consideration of the following issues with respect to the Petitioners' and Respondents' claims:

> • All counterclaims by the Respondents based on misrepresentation, penalties paid to Petrobras, costs of sending additional individuals to the yard, "financial damage with suppliers, customers and banks," costs of renegotiating hedging contracts, and costs "incurred after delivery to carry out completion work and to perform commissioning" of the vessels.

- Payments by SDL under the deferred milestones of the shipbuilding contracts, and whether these payments may be set-off under the Security Assignment.

- All issues as to costs.

(Moodhe Dec'l Ex. 1 at 4-5.)

Since the UK interim awards did not fully dispose of Petitioners' claim for breach of contract, and did not yet reach the merits of any of Respondents' counterclaims, the UK interim awards cannot be considered final. *See Michaels*, 624 F.2d at 414 (holding that the award "did not finally dispose of any of the claims submitted and left open the question of damages," making it an interlocutory award that could not be reviewed by the district court).

**B.     The UK Interim Awards Do Not Fall Within the Limited Exception to the General Finality Requirement**

The limited exception to the rule that only a final arbitral award can be confirmed applies only when an arbitration fully decides a separate and independent claim that is subject to neither abatement nor set off. *Metallgesellschaft*, 790 F.2d at 283. Under this exception, a court is not precluded from confirming a partial award if it finally and definitely disposes of a separate, severable and independent claim, even if the interim award did not dispose of all the claims that were submitted to arbitration, so long as that claim is not subject to set-off. *Id.*; *see Employers' Surplus*, 2008 WL 337317 at *6 (explaining further that "[d]isposition of an issue that is *severable* from other issues still before the arbitrator may be deemed final and subject to confirmation") (omitting internal citation); *Fluor Daniel Intercontinental, Inc. v. Gen. Elec. Co.*, 06 Civ. 3294, 2007 WL 766290 at *2 (S.D.N.Y. Mar. 13, 2007) (explaining that the partial award must be capable of determination without reference to the remaining, legally irrelevant issues).

That exception does not apply here.  Because the tribunal has only determined a portion of Petitioners' breach of contract claim, and furthermore because such amounts may be set off against Respondents' still undetermined counterclaims, CIMC does not have a single, independent claim that was fully disposed.  CIMC asserts $43.7 million in damages based on a singular breach of contract claim, consisting of both "deferred portions of the contract price" and change orders.  (Moodhe Dec'l Ex. 1 at 7.)  *Compare* (Schahin Decl. Ex. A at 14-5 ¶ 22-24), *with* (Schahin Decl. Ex. A at 30-1 ¶ 22-24) (In both amended Points of Claims submitted in the UK arbitrations, the Petitioners demanded amounts under the respective Shipbuilding Contracts and change orders together).  *See also* (Schahin Dec'l Ex. B at 3); *see also* (Schahin Dec'l Ex. B at 4) (In their Position Paper for the Procedural Hearing, Petitioners also consolidated the sums under the Shipbuilding Contracts and the change orders as one claim).  Moreover, the tribunal also views Petitioners' damages as stemming from a single claim.  *See* Moodhe Decl. Ex. 1 at 7 (In their "Reasons for Awards on Preliminary Issues," the Tribunal stated that the Petitioners have one claim, but divide Respondents' "cross-claims" into three categories.)

The interim awards, then, granting only $16 million plus interest of Petitioners' entire $43.7 million claim did not fully dispose of Petitioners' breach of contract claim, as it only assessed damages based on change orders and BDL's damages from the deferred contract price, and did not determine that portion of Petitioners' claim stemming from SDL's deferred contract price.  *Id.* at 35.  Since the tribunal did not fully determine liability and damages for the entirety of Petitioner's separate and independent breach of contract claim, the interim awards are not final as to Petitioners' claim.  *See Michaels*, 624 F.2d at 414 (holding that where an interim award did not decide any of one entity's claims, "it obviously was not a final determination of all issues submitted."); *Pearl Seas Cruises, LLC v. Irving Shipbuilding Inc.*, 10 Civ. 1294 , 2011

WL 577333 (D. Conn. Feb. 9, 2011) (holding the interim award non-reviewable and finding that the arbitral tribunal determined only interim issues, such as liquidated damages, contract termination, and certification, and not entire claims, particularly the "ultimate claims for damages").

Furthermore, the amounts awarded to Petitioners in partial resolution of their breach of contract claim can be set off against Respondents' still undetermined counterclaims. *See* Moodhe Decl. Ex. 1 at 26 (in which the tribunal expressly "reserve[d] for further consideration" the merits underlying all of Respondents' counterclaims). As stated in *Metallgesellschaft*, a Court should not confirm an interim award, even if it fully disposes of a separate and independent claim, if it is subject to set off or abatement. 790 F.2d 280 at 283. Although the UK interim award grants Petitioners $16 million, that amount is a small fraction of the Respondents' counterclaims, which total $360 million and are therefore capable of fully setting off the interim award. 80 C.J.S., Set-off and Counterclaim § 3 (2013) ("The right of set-off is a common-law right, which belongs to every creditor, to apply unappropriated monies of the debtor, in his or her hands, in extinguishment of debts due to him or her.")

## III.  EVEN IF THE COURT WERE INCLINED TO CONFIRM THE INTERIM AWARDS, SUCH CONFIRMATION SHOULD BE STAYED UNTIL AFTER RESOLUTION OF THE CHALLENGE CURRENTLY PENDING IN THE UK

The New York Convention allows a court to adjourn enforcement of an award if a party has appealed to set aside or suspend that award. The Convention on the Recognition and Enforcement of Foreign Arbitral Awards, June 6, 1958, Article VI. In *Europcar Italia, S.p.A. v. Maiellano Tours, Inc.*, 156 F.3d 310 (2d Cir. 1998), the Second Circuit enunciated six factors a district court should consider in determining a stay:

> "(1) the general objectives of arbitration—the expeditious resolution of disputes and the avoidance of protracted and expensive litigation;

> (2) the status of the foreign proceedings and the estimated time for those proceedings to be resolved;
>
> (3) whether the award sought to be enforced will receive greater scrutiny in the foreign proceedings under a less deferential standard of review;
>
> (4) the characteristics of the foreign proceedings including (i) whether they were brought to enforce an award (which would tend to weigh in favor of a stay) or to set the award aside (which would tend to weigh in favor of enforcement); (ii) whether they were initiated before the underlying enforcement proceeding so as to raise concerns of international comity; (iii) whether they were initiated by the party now seeking to enforce the award in federal court; and (iv) whether they were initiated under circumstances indicating an intent to hinder or delay resolution of the dispute;
>
> (5) a balance of the possible hardships to each of the parties, keeping in mind that if enforcement is postponed under Article VI of the Convention, the party seeking enforcement may receive 'suitable security' and that, under Article V of the Convention, an award should not be enforced if it is set aside or suspended in the originating country . . . ; and
>
> (6) any other circumstances that could tend to shift the balance in favor of or against adjournment."

156 F.3d at 317-18.  Of these, the fourth factor has been considered the most important.  *See Nedagro B.V. v. Zao Konversbank*, 02 Civ. 3946, 2003 WL 151997 at 7 (S.D.N.Y. Jan. 21, 2003).

The *Europcar* factors weigh in favor of granting a stay in this case.  On June 21, 2013, Respondents filed a challenge to the interim awards, based on procedural irregularities, to the UK High Court.  (Schahin Dec'l. Ex. D).  In conjunction with that appeal, Respondents filed an application for a stay of the interim awards in the UK, and recently the UK High Court has scheduled a hearing for November 8, 2013, to consider the stay.  These motions are currently pending.  Pursuant to factor four, the fact that Respondents moved to stay and challenge the awards three weeks prior to Petitioners' confirmation action implicates serious issues of

international comity should this Court not stay its determination.  Furthermore, it strongly

indicates that the challenge is not intended to hinder or delay either resolution or confirmation.

*Cf. MGM Prods. Group, Inc. v. Aeroflot Russian Airlines*, 573 F.Supp.2d 772, 778 (S.D.N.Y.

May 14,  2003).  Under the second *Europcar* factor, Respondents have diligently sought an early

hearing date, scheduled for November 8, 2013.  (Schahin Dec'l. ¶ 20).  As the Second Circuit

cautioned in *Europcar*, where "there is a possibility that the award will be set aside, a district

court may be acting improvidently by enforcing the award prior to the completion of the foreign

proceedings."  156 F.3d 310 at 317.  Consequently, in the event that Petitioners' motions are not

dismissed, confirmation of the interim awards should at a minimum be stayed until determination

of the stay and challenge applications in the United Kingdom in order to avoid the inconsistency

of the award being invalidated in the United Kingdom and recognized here in New York.  *See*

*Nedagro,* 2003 WL 151997 at *6 (staying confirmation proceeding in light of pendency of

appeal in Russia which raised concerns of "international comity" and the possibility of an

"inconsistent result").  In fact, such a result has almost resulted once before in the larger context

of this ongoing dispute, when CIMC attempted to have a partial summary judgment award

against Schahin Holding recognized by the New York Supreme Court.  When the partial

summary judgment was unanimously overturned by the UK Court of Appeal, CIMC's hurried

recognition motion was *sub judice* before the Honorable Justice Coin. *See* Schahin Dec'l. Ex. G

(requesting dismissal of Petitioners' summary judgment in lieu of complaint for recognition of a

partial summary judgment against Schahin Holding, as the partial summary judgment was

unanimously set aside on appeal).

## CONCLUSION

For the reasons stated herein, Respondents respectfully requests that this Court

dismiss CIMC's Petition to Confirm a Foreign Arbitration Award and for an Entry of Judgment

or, in the alternative, stay the proceedings until the conclusion of the appeals process currently

pending in the United Kingdom.


Dated:      New York, New York
            August 7, 2013

                                        Respectfully submitted,

                                        Linklaters LLP

                                        By:     /s/ Paul S. Hessler
                                        Paul S. Hessler
                                        Patrick C. Ashby
                                        1345 Avenue of the Americas,
                                        New York, NY 10105
                                        (212) 903-9000
                                        (212) 903-9100 (fax)

                                        *Attorneys for Baerfield Drilling LLC and*
                                        *Soratu Drilling LLC*