# EXHIBIT B

AMERICAN ARBITRATION ASSOCIATION
INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
                                                                  :
CIMC Raffles Offshore (Singapore) Limited and                     :
Yantai CIMC Raffles Offshore Limited,                             :
                             Claimants,                  :
                                                                  :    50 148 T 00348 12
       v.                                                         :
                                                                  :
Schahin Holding S.A., Schahin Engenharia S.A.,                    :
Sea Biscuit International Inc., Black Gold Drilling               :
LLC, Baerfield Drilling LLC and Soratu Drilling                   :
LLC,                                                              :
                             Respondents.                :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X


# CLAIMANTS' REPLY TO RESPONDENTS' MEMORIAL


                                         David W. Rivkin
                                         DEBEVOISE & PLIMPTON LLP
                                         919 Third Avenue
                                         New York, New York  10022
                                         United States of America
                                         dwrivkin@debevoise.com

                                         *Counsel for Claimants CIMC Raffles*
                                         *Offshore (Singapore) Limited and*
                                         *Yantai CIMC Raffles Offshore Limited*


October 15, 2012

# **TABLE OF CONTENTS**

I.    Preliminary Statement ........................................................................................1

II.   Argument ............................................................................................................1

      A.    Respondents Concede Claimants' Central Argument that CIMC Raffles Is Entitled to Repayment of Advances. ..........................................1

      B.    Respondents Have No Valid Justifications for a Stay. ...............................2

          (1)   Respondents' Contemporaneous Evidence Only Supports the Notion that the ECAs Were Designed to Provide Short-Term Loans. ........................................................................................2

          (2)   The So-Called "Core Dispute" Has No Bearing on This Arbitration. ....................................................................................4

          (3)   BDL and SDL Are Unlikely to Prevail in the London Arbitrations. ....................................................................................5

          (4)   Granting Claimants Repayment of the Advances Now Would Be Fair to Respondents and an Efficient Use of Arbitral Resources. ........................................................................6

      C.    Respondents Have No Equitable Right of Setoff. ......................................7

          (1)   The Mutuality Rule Cannot Be Relaxed for Respondents ................8

          (2)   BDL's and SDL's Counterclaims in London Are Not Sufficiently "Due and Payable." ......................................................9

III.  Costs and Attorney Fees ...................................................................................10

IV.   Conclusion ........................................................................................................10

# **TABLE OF AUTHORITIES**

**CASES**

*124 Ferry St. Realty Corp. v. Lefkowitz (In re 124 Ferry St. Realty Corp.)*, 86
    A.D.2d 928, 448 N.Y.S.2d 802 (3d Dep't 1982) .................................................................8, 9, 10

*Allentown Foundry & Mach. Works v. Lorez*, 16 A.D. 72 (2d Dep't 1897) ....................................4

*Beecher v. Peter A. Vogt Mfg. Co.*, 227 N.Y. 468, 125 N.E. 831, (N.Y. 1920) ..............................8

*De Camp v. Thomson et al*, 13 E.H. Smith 444 (N.Y. 1899) .........................................................7

*Drake v. Pierce Butler Radiator Corp.*, 202 Misc. 935, 116 N.Y.S. 2d 712 (Sup.
    Ct. Onondonga Cty. 1952)...................................................................................................7, 8, 10

*Dunn v. Uvalde Asphalt Pav. Co.*, 13 Bedell 214, 67 N.E. 439 (N.Y. 1903)..................................9

*Gerseta Corporation v. Equitable Trust Co. of New York*, 241 N.Y. 418, 150 N.E.
    501 (N.Y. 1926)....................................................................................................................8

*In the Matter of Fehlaber Corp. v. O'Hara*, 384 N.Y.S. 2d 270 (3d Dep't. 1976) .....................8, 9

*In the Matter of Northville Industries Corp. v. State of New York, et al.*, 788
    N.Y.S. 2d 464 (3d Dep't 2005)............................................................................................8, 9

*Matter of Mutuel Tickets Agents Union, Local 23293, AFL-CIO v McCall*, 210
    A.D. 2d 845 (3d Dep't 1994).................................................................................................8, 10

*Munger v. Albany City National Bank*, 40 Sickels 580, 85 N.Y. 580 (N.Y. 1881) .....................7, 8

**OTHER AUTHORITES**

Timothy P.W. Sullivan, *Swapped Disincentives: Will Clearinghouses Mitigate the
    Unintended Effects of the Bankruptcy Code's Swap Exemptions?*, 80 Fordham
    L. Rev. 1491 (Dec. 2011) ....................................................................................................9

CIMC Raffles Offshore (Singapore) Limited and Yantai CIMC Raffles Offshore Limited make this submission in reply to Respondents' Memorial ("RM") pursuant to paragraph 10 of the Tribunal's Procedural Order No. 1, entered July 30, 2012.

## I.   Preliminary Statement

1. Respondents ignore, and thus concede, Claimants' arguments that they are entitled to repayment of their Advances plus interest.[1] Claimants respectfully submit the issue of liability under the ECAs has now been conclusively resolved. The only question that remains for the Tribunal's consideration is whether Respondents have established their case for a stay or for a setoff.

2. Respondents offer a series of justifications for a stay. Some of them, such as their claim that the "core dispute" in the London Arbitrations will resolve liability in this case, are undeniably wrong. Only this Tribunal can award Claimants the amount due in the ECAs. Neither this Tribunal nor the London panels have the ability to set-off amounts from other agreements, because each only has jurisdiction over its contract.

3. Likewise, Respondents' request for a setoff must be dismissed as contrary to the general principles of equity under New York law. Respondents cannot ask this Tribunal to jettison well-established rules on the equitable right of setoff on the basis of inapplicable exceptions. Respondents Sea Biscuit, Schahin Holding S.A., Schahin Engenharia, and Black Gold fail to pass the rule of mutuality, and BDL's and SDL's counterclaims are not due and payable. As a matter of New York law and equity, Respondents are not entitled to a setoff.

## II.   Argument

### A.   Respondents Concede Claimants' Central Argument that CIMC Raffles Is Entitled to Repayment of Advances.

4. Respondents completely ignore Claimants' main argument that they are entitled to repayment of their Advances plus interest. In their Pre-Hearing Submission, Claimants proved that (i) the ECAs are valid contracts; (ii) Claimants advanced Respondents $66,125,587 under the ECAs; (iii) Respondents were bound by the terms of the ECAs to repay the Advances; and (iv) Respondents have not made repayments. Claimants definitively established that Respondents are liable for repayment of the Advances through the use of contemporaneous documents, hearing testimony of a key Schahin official, and the plain text of the ECAs.[2]

5. Respondents failed to challenge or even address Claimants' arguments or evidence in this regard. While Respondents repeatedly alleged that the ECAs "are part of the damages

---

[1]   Capitalized terms used but not defined herein have the meaning stated in the Claimants' Pre-Hearing Submission ("CM").

[2]   *See* CM ¶¶ 44-59.

1

caused by Claimants' defaults under the Shipbuilding Contracts,"[3] they never once argued that the Advances were not required to be repaid or contested any of the other four key facts that Claimants established with overwhelming evidence. Such a conspicuous decision to ignore Claimants' arguments and related evidence must be taken as a tacit acknowledgment of Respondents' liability.

6. By failing to address this evidence, Respondents admit that:

- The ECAs are valid contracts that clearly establish the Parties' rights and obligations.

- Pursuant to the terms of the ECAs, Claimants loaned Respondents $66,125,587.

- Respondents failed to obtain consents to convert the ECAs and were obligated to repay Advances on or about July 29, 2011 and November 21, 2011, in accordance with Article 4.6 of the ECAs.

- When Respondents failed to repay the Advances, Claimants sent numerous demand letters.

- Respondents repeatedly acknowledged their obligations under the ECAs and requested a six-month extension to obtain the consents.

- Respondents have not repaid the Advances or their interest.

7. Respondents have had numerous opportunities to marshal a defense to the central issues in this dispute. They have failed. The question of liability in this matter is therefore conclusively settled.

**B.  Respondents Have No Valid Justifications for a Stay.**

8. Respondents concede the question of liability in these proceedings but attempt to delay their obligations to repay the Advances with a request for a stay. None of their rationales for a stay is valid.

   *(1) Respondents' Contemporaneous Evidence Only Supports the Notion that the ECAs Were Designed to Provide Short-Term Loans.*

9. Respondents attempt to justify a stay by arguing that the ECAs were partial compensation for alleged breaches under the Shipbuilding Contracts.[4] Whether or not the ECAs were meant to be compensation is irrelevant, because even if their low interest rates were meant to be compensation, Article 4 of the ECAs makes clear that the Advances had to be repaid. The few documents Respondents cite, including Fernando Schahin's witness statement, do not disagree with this fact. The Tribunal will recall that Mr. Schahin specifically admitted in his

---

[3]  RM ¶ 27.
[4]  *Id.* ¶ 21.

2

testimony in the Attachment Petition, that the Advances needed to be repaid.[5] It is therefore not surprising that Respondents were unable to produce any contemporaneous documents establishing that the ECAs were "compensation."

10.  Claimants and Respondents agree that the ECAs were drafted in response to construction delays, although the Parties disagree on the cause of the delays.[6] Both Parties acknowledge that the ECAs were crafted to require Claimants to advance funds to Respondents if the Vessels were not delivered by a particular date.[7] And both Parties agree that the Advances had to be repaid by Respondents or converted into equity.[8]

11.  Claimants presented more than twenty contemporaneous documents to establish that the ECA Advances were short-term loans and created obligations independent of the Shipbuilding Contracts.[9] Claimants relied on specific contractual provisions, internal Schahin documents, and statements made by Schahin officials or Schahin external lawyers to establish their case.  In particular, Claimants offered emails illustrating the fact that the Board of CIMC Raffles directly refused Fernando Schahin's request for damages beyond those already provided for in the Shipbuilding Contracts' liquidated damages clause.[10] Moreover, compensation for any delays under the Shipbuilding Contracts is provided in the liquidated damages provision in the Shipbuilding Contracts, not in the ECAs.

12.  In Respondents' memorial, they failed to challenge or even specifically address these documents.  With the exception of a self-serving witness statement prepared for use in these proceedings, Respondents only offered a few documents to support their "compensation" theory.  Respondents partially quote a December 7, 2009 email from Fernando Schahin, the Schahin Entities' CFO, to Brian Chang, CIMC Raffles' Executive Deputy Chairman.  Quoted in full, Mr. Schahin explained in the email: "Equity agreement between us for future delays contingent equity support (needed because of some banks approvals based on this and also to support future penalties and more interest during construction from banks)."  Despite Respondents' attempts to mischaracterize this statement, Mr. Schahin simply noted that the ECAs were necessary to provide Respondents with funds to pay bank penalties and interests. The email also explains that CIMC Raffles' support was to come in the form of "equity," not damages.

13.  The other contemporaneous evidence provided by Respondents consistently supports Claimants' version of events.  Respondents' documents do not use the words

---

[5] *See* CE-35 at 14:13-14:19; 14:26-15:9.

[6] CE-79 ¶ 7.

[7] The ECAs were signed by the Parties on August 23, 2010. The dates that triggered Claimants' obligations to make the Advances were July 31, 2010 for SDL and September 30, 2010 for BDL. CE-1 at Art. 2.1; CE-2 at Art.2.1. Claimants started making the SDL Advances a few days after the ECAs were signed and the BDL Advances two months later. *See* CE-23; CE-24.

[8] *See* CE-35 at 14:13-14:19; 14:26-15:9 ; CE-79 ¶ 15.

[9] *See* CM ¶¶ 80-92.

[10] CE-59; *see also* CM ¶ 85.

3

"compensation" or "damages" to describe the ECAs or the ECA Advances. The documents do, however, describe the ECAs as "credit agreements"[11] and the Advances as "loans and financing,"[12] and confirm that Respondents were required to convert the Advances into equity or repay them.[13] Of course, Respondents' "compensation" theory also makes no sense under the structure of the ECAs, because if Respondents had converted the Advances into equity as they originally intended, the issue of repayment of the Advances would never have arisen.

      *(2)  The So-Called "Core Dispute" Has No Bearing on This Arbitration.*

   14. Respondents dedicate significant space, roughly 40% of their memorial, to discussing what they consider to be the "core dispute" between the Parties.[14] Respondents describe this "core dispute" as CIMC Raffles' misrepresentations with respect to their shipbuilding capacities and CIMC Raffles' delays in constructing the Vessels. Respondents appear to make two claims about this "core dispute," both of which are wrong.

   15. First, Respondents argue that the "core dispute" being heard in London will resolve issues under the ECAs, and thus a stay is appropriate.[15] Respondents state "the disputes currently underway in London will, in all likelihood (regardless of the outcome) fairly settle the dispute currently before this Tribunal."[16] However, the Tribunals in London have no jurisdiction to make a ruling on liability under the ECAs or to deduct from any counterclaim award they may render the $66,125,587 (plus interest) due to Claimants under the ECAs. Only this Tribunal has the jurisdiction to award Claimants the amount due to them under the ECAs. Indeed, Respondents have not deducted from their counterclaims in the London Arbitrations the amounts they owe under the ECAs. Thus, even if Respondents are correct that a stay may be warranted "where the decision of one action will determine the rights set up in the others,"[17] the decisions in the London Arbitrations *will not* determine any rights in these proceedings.

---

[11] RE-76 at 2-3; RE-77 at 2-3.

[12] CE-26 at 2.

[13] *See* CE-1; CE-2; CE-56. Respondents also mischaracterize the April 2011 email from Diane Chen. *See* RM ¶ 24. Ms. Chen does not state that Claimants were responsible for the delays. *See* CE-56.

[14] *See* RM ¶¶ 7-20, 28-32.

[15] *See id.* ¶ 5.

[16] *See id.* ¶ 5; *see also id.* ¶ 31(". . it does not make sense to award Claimants a recovery here . ."); *id.* ¶ 30 ("Indeed, the only manner in which the decision of this arbitration panel results in a truly 'final' disposition is if it is rendered *after* the judgments in the London Arbitrations are rendered."); *id.* ¶ 43 ("A stay, in contrast, would allow the parties to fully arbitrate the crux of their disputes, resolution of which would also provide closure in this matter.").

[17] *See id.* ¶ 30 (quoting *Allentown Foundry & Mach. Works v. Lorez*, 16 A.D. 72, 72 (2d Dep't 1897)).

16. Respondents also state "once the London Arbitrations are completed and judgments have been issued, the amounts due to Respondents will be settled and a final accounting will be possible."[18] Again, neither this Tribunal nor the London tribunals can make an accounting because they each have jurisdiction only over the contracts that established them. If the Parties had wanted consolidated arbitrations or a final accounting only after all arbitrations were done, they could have so provided, but they did not. The overwhelming number of parties to the ECAs simply have no interest in the Shipbuilding Contracts. Respondents' arguments fail to acknowledge the simple fact that the ECAs and the Shipbuilding Contracts are separate legal agreements with different dispute resolution provisions.

> (3)    *BDL and SDL Are Unlikely to Prevail in the London Arbitrations.*

17. Respondents also suggest that it is likely that the "core dispute" will be resolved in their favor.[19] Respondents dwell on the details of their counterclaims in an apparent effort to make the Tribunal feel sympathetic to their alleged plight. As Respondents concede, however,[20] the details of the London disputes play no role in the determination of liability in this Arbitration and are immaterial.[21]

18. Nevertheless, Respondents' consistent focus on these details requires a brief response from Claimants. Claimants commenced the London arbitrations because the Respondents failed to complete their payments for the Vessels once the ships were delivered. CIMC Raffles claims a substantial amount, over US$ 43.5 million, in the two proceedings. As in this action, BDL and SDL do not dispute the sums claimed by Claimants are due, but instead raise counterclaims. Claimants completely deny BDL's and SDL's counterclaims and are vigorously defending against them. The London panels are likely to deny BDL's and SDL's counterclaims for a number of reasons:

- *First*, Claimants never made the misrepresentations that Respondents allege. Even if made, the statements were true or statements of opinion or future expectations that BDL and SDL have no basis for alleging actionable representations.

- *Second*, the Shipbuilding Contracts contain a cap on the maximum liquidated damages that can be claimed by BDL and SDL. The capped amount has already been reached and deducted from the amount due to Claimants.

- *Third*, although Respondents argue here that the liquidated damages provisions in the Shipbuilding Contracts are null and void on the basis of misrepresentations,[22]

---

[18]   *See* RM ¶ 29.

[19]   *See id.* ¶ 31.

[20]   *See id.* ¶ 41.

[21]   If the Tribunal has any curiosity as to the precise nature of Claimants' claims and defenses against BDL's and SDL's counterclaims, Claimants would be happy to provide those papers to the panel.

[22]   *See id.* ¶ 42.

5

BDL and SDL have now taken a different position in the London Arbitrations. This is not surprising because the relevant provisions dealing with the amount of liquidated damages payable, and the cap on such damages, were the subject of the final Shipbuilding Contract amendments, signed in May 2010, three years after Respondents claimed they became aware of Claimants' misrepresentations.[23]

- *Fourth*, contrary to BDL's and SDL's claims, the Vessels were delivered only ten and sixteen days late.[24]

- *Fifth*, the Vessels were complete at delivery, which BDL and SDL acknowledged by signing the delivery documents.[25] The executed delivery documents and the terms of the Shipbuilding Contracts effectively bar them from claiming delivery was incomplete.

19. Respondents incorrectly attempt to conflate the issues raised exclusively under the Shipbuilding Contracts with the matter at hand. Their attempts should be rejected because the Shipbuilding Contracts and the ECAs are separate agreements and the rights and liabilities under them are completely unrelated.

> (4) *Granting Claimants Repayment of the Advances Now Would Be Fair to Respondents and an Efficient Use of Arbitral Resources.*

20. Respondents allege that denying a stay would be "unjust and unfair" to their interests. In the event that a stay is not granted, Respondents complain that they would have to pay Claimants money in advance of the "ultimate accounting between the parties."[26] This statement is inarguably false because the London Arbitrations will not provide the Parties a final accounting of all of their disputes.

---

[23] In the London Arbitrations, BDL and SDL now argue that the liquidated damages cap is not enforceable as a penalty. This makes no sense under English law because the question of whether a liquidated damages provision is a penalty can only arise where the agreed liquidated damages are too high not, as BDL and SDL will presumably argue in London, too low.

[24] In their memorial, Respondents allege that Claimants relied on unexecuted drafts of the Eighth Amendment to the BDL Shipbuilding Contract and the Twelfth Amendment to the SDL Shipbuilding Contracts to establish that the delivery dates of the Vessels had been altered from April 2, 2009 to April 15, 2011 for BDL's vessel and December 7, 2009 to October 20, 2010 for SDL's vessel. *See* RM ¶12, n3. This is wrong. Claimants entered into evidence fully executed versions of the final Shipbuilding Contract amendments and their final Annexes. CE-10; CE-11. Nevertheless, the question of delivery dates under the Shipbuilding Contracts is wholly immaterial to these proceedings, as those dates are not tied to any obligations under the ECAs.

[25] CE-19; CE-20; CE-21; CE-22.

[26] *See* RM ¶ 43.

21.     Nevertheless, Respondents' purported concerns of having to exchange funds back and forth is unlikely to occur because BDL's and SDL's counterclaims will probably not succeed. Respondents owe CIMC Raffles in excess of $208 million, plus accrued interest and legal fees.[27] In the true final accounting between the Parties, after all of the separate disputes have been resolved, Respondents will likely owe Claimants substantial amounts. Because only this Tribunal is empowered to award the relief sought in this Arbitration, the Tribunal should do so promptly, in accordance with the timetable set out in the ECAs. A setoff can be argued at the enforcement stage if Respondents fail to comply voluntarily with the award.

22.     The issues before this Tribunal are already fully briefed and ready for adjudication. A stay would necessitate an additional hearing and therefore waste time and money. Moreover, a stay would be truly harmful to Claimants. The Schahin Entities have a history of delaying payment of funds they know are due.[28] In fact, Schahin Holding is currently in breach of the UK High Court's summary judgment, dated May 21, 2012. Schahin Holding did not apply for a stay and, accordingly, the summary judgment should have been paid within 14 days of the order, notwithstanding Schahin Holding's appeal. Claimants need an award now in order to start the collection process.

### C. Respondents Have No Equitable Right of Setoff.

23.     Respondents concede that they have no contractual or statutory right of setoff.[29] The remaining question before this Tribunal is whether Respondents meet the requirements under New York law for an equitable right of setoff, which have the same requirements as the common law right of setoff.[30] New York law is clear about what equity requires for an equitable right of setoff: a party may seek an equitable right of setoff only if it can meet the mutuality rule and if it can establish that the amount it wishes to setoff is "due and payable" at the time the action is brought.[31] On the law, Respondents do not effectively challenge these well-established

---

[27]  In addition to these proceedings and the London Arbitrations, Claimants are seeking a total of US$98.5 million in the UK High Court against Schahin Holding S.A. under the Deed of Guarantee and Indemnity.

[28]  For example, Consub Delaware LLC received a summary judgment award of US$4.7 from Schahin Engenharia in 2009 after struggling for eight years to get the Schahin Entities to pay two invoices for services rendered. *See* CE-80.

[29]  *See* RM ¶ 40.

[30]  *Drake v. Pierce Butler Radiator Corp.*, 202 Misc. 935, 941, 116 N.Y.S. 2d 712, 717 (Sup. Ct. Onondonga Cty. 1952); *Munger v. Albany City National Bank*, 40 Sickels 580, 85 N.Y. 580, *5 (N.Y. 1881) (Principles of legal or equitable setoff are that "the debts must be mutual, must be in the same right.").

[31]  *See, e.g., De Camp v. Thomson et al*, 13 E.H. Smith 444, 448 (N.Y. 1899) ("The general rule relating to this subject is that claims or demands sought to be set off must not only be mutual to the extent that they are owing by each to the other, but they must be due and payable, and therefore a claim not due cannot be set off against one that may be presently enforced.").

rules.[32] On the facts, Respondents cannot meet these requirements and are therefore barred from claiming an equitable right of setoff.

24. Respondents' reliance on Article 6.3 of the ECAs does not advance their argument because general principles of equity under New York law mandate these rules. Any reference in the ECAs to "equity" in Article 6.3 necessarily incorporates New York law, chosen in Article 22.1 of the ECAs. If the Parties had intended for a countervailing set of equities not recognized under New York law to apply, they would have plainly and clearly set out those requirements in the choice of law section in the ECAs.

(1) *The Mutuality Rule Cannot Be Relaxed for Respondents.*

Respondents argue that, under New York law, "equity relaxes" the rule of mutuality. For this proposition, they cite and partially quote only one source, *Drake v. Pierce Butler Radiator Corp.* 202 Misc. 935, 941, 116 N.Y.S. 2d 712, 717 (Sup. Ct. Onondonga Cty. 1952).[33] However, *Drake v. Pierce Butler Radiator Corp*, quoted in full, proves to be inapplicable in the present dispute. The quotation in full states:

> The courts of law and equity follow the same general doctrines on the subject of set-off. * * * Debts, to be applied against each, must be mutual. * * * To be mutual, they must be due to and from the same persons in the same capacity. * * * Assignees are not to be held subject to the burdens of independent counterclaims accruing after the assignment. * * * <u>Equity relaxes these rules, and goes beyond the law, only when the departure is necessary to prevent wrong and injustice.</u>* * *[34] (emphasis added.)

25. No wrong or injustice would be prevented if this Tribunal were to apply the rule of mutuality and deny Respondents' request for a setoff. Respondents are sophisticated parties that negotiated the ECAs at arm's length for over a year, during which they separately agreed to amendments to the Shipbuilding Contracts. The Tribunal will recall that Fernando Schahin, the CFO of these companies, was the individual who proposed the idea of the ECAs to CIMC

---

[32] Respondents argue that Claimants' authorities on the law of setoff are "inapposite" because they deal with contractual or statutory rights of setoff. See RM ¶ 40. This is incorrect. *See In the Matter of Fehlaber Corp. v. O'Hara*, 384 N.Y.S. 2d 270, 272 (3d Dep't. 1976) (applying the common law right of setoff); *In the Matter of Northville Industries Corp. v. State of New York, et al.*, 788 N.Y.S. 2d 464, 465 (3d Dep't 2005) (same); *Matter of Mutuel Tickets Agents Union, Local 23293, AFL-CIO v McCall*, 210 A.D. 2d 845, 847 (3d Dep't 1994) (same). Respondents also contend that disputes relating to NY CPLR Article 78 proceedings, in which the common law right of setoff is applied, are particularly inapplicable. Respondents fail to explain why and, in fact, cite an Article 78 proceeding (*124 Ferry*) to advance their own setoff arguments. See RM ¶¶ 38, 40.

[33] *See id.* ¶ 36.

[34] *Drake*, 202 Misc. at 941 (internal citations omitted.) (quoting *Beecher v. Peter A. Vogt Mfg. Co.*, 227 N.Y. 468, 473 125 N.E. 831, 833 (N.Y. 1920)). Under New York law, courts tend to relax the rules in the situation only where on debtor is insolvent. *See, e.g., Gerseta Corporation v. Equitable Trust Co. of New York*, 241 N.Y. 418, 424 150 N.E. 501, 500 (N.Y. 1926); *Munger*, 40 Sickels at *4.

Raffles.[35]  Respondents benefited immensely from the contracts when they received a loan of over $66 million at a low interest rate.  Any suggestion by Respondents that the terms of the ECAs are unfair should gain no traction.

26.  The ECAs require this Tribunal to adjudicate the dispute on the basis of New York law, not on "practical" considerations.  Respondents have no basis in equity to jettison the rule of mutuality.  Respondents Sea Biscuit, Schahin Holding, Schahin Engenharia S.A., and Black Gold are not entitled to a right of setoff, because they have no mutual debts against Claimants.

        (2)     *BDL's and SDL's Counterclaims in London Are Not Sufficiently "Due and Payable."*

27.  Respondents' counterclaims need to be "due and payable" to be appropriate for a setoff according to the weight of authorities under New York law.[36]  Respondents attempt to lower this standard by citing to *124 Ferry St. Realty Corp. (In re 124 Ferry St. Realty Corp.)* 86 A.D. 2d 928,928, 448 N.Y.S. 2d 802,802 (3d Dep't 1982) and arguing that the case supports the notion that their counterclaims need only "constitute existing viable causes of action" to be appropriate for setoff.[37]  However, in *124 Ferry St.*, the court found that because there was no reply filed to the counterclaim used for the setoff, the counterclaim debt was "deemed to be admitted, and as such, is fixed and certain."[38]  The court's understanding of what constituted a "viable cause[] of action" was therefore a counterclaim that had been admitted and a debt that was "fixed and certain."

28.  As explained above, BDL's and SDL's counterclaims are being strongly challenged by Claimants.  The London panels have not found them to be admitted, fixed or certain.  Even using the standard set out in *124 Ferry St.*, BDL's and SDL's counterclaims still remain contingent liabilities that are unsuitable for setoff under New York law.

29.  The right to setoff makes logical sense "[i]f A is indebted to B, and B is likewise indebted to A."[39]  However, the remedy is wholly inappropriate when, as here, A and C are both indebted to B, but B is not indebted to C, and it is not yet clear if B will ever be indebted to A.  Respondents do not offer a single case reflecting a situation analogous to their own in which a

---

[35]    CE-60 at 1.

[36]    *See, e.g., Northville Industries,* 788 N.Y.S. 2d at 465; *Fehlaber Corp*, 384 N.Y.S. 2d at 272; *Dunn v. Uvalde Asphalt Pav. Co.*, 13 Bedell 214, 218-219, 67 N.E. 439, 440 (N.Y. 1903) ("One of the essentials of equitable set-off is that the demand of the party claiming the right must be due at the time when the ground for equitable intervention arises.").

[37]    RM ¶ 38.

[38]    *124 Ferry St.*, 86 A.D.2d at 928.

[39]    Timothy P.W. Sullivan, *Swapped Disincentives: Will Clearinghouses Mitigate the Unintended Effects of the Bankruptcy Code's Swap Exemptions?*, 80 Fordham L. Rev. 1491, 1511 (Dec. 2011)(quoting 5 Colliers on Bankruptcy P.553.01(Alan N. Resnick & Henry J. Somme reds., 16th ed.).

court found that the parties had an equitable right of setoff.[40] The general principles of equity are clear. Respondents are not entitled to an equitable right of setoff.

### III.     Costs and Attorney Fees

30.     Article 22.2 of the ECAs provides that the Parties shall bear their own legal fees and that the costs, fees, and expenses of the arbitrators shall be shared equally. In their Statement of Defense, Respondents requested an award granting "Respondents their costs and expenses, including attorneys' fees . . . ."[41] Claimants accepted what appeared to be an offer to renegotiate the terms of Article 22.2 and to allow attorneys' fees and other costs to be awarded to the prevailing party.[42] Respondents now assert that their request was not a renegotiation of Article 22.2's terms.[43] Given the weakness of their case, it is unsurprising that Respondents have no interest in making costs and fees follow the results.

31.     The terms of Article 22.2 now must be applied, and irrespective of Respondents' initial request, the Parties should be required to bear their own legal fees and share arbitration costs.

### IV.     Conclusion

32.     For all of these reasons, Respondents' request for a stay and a setoff should be denied, and an award granting the relief outlined in paragraph 97 of Claimants' Pre-Hearing Submission should be issued promptly.

---

[40] *See Mutuel Tickets*, 210 A.D.2d at 845 (refusing to set-off a claim that was being "vigorously contested" because the claim was "contingent" and hence "inappropriate" for the right of setoff); *124 Ferry St.*, 86 A.D.2d at 928 (accepting an uncontested counterclaim for a setoff because it was admitted, fixed and certain); *Drake*, 202 Misc. at 935 (declining to give a judgment setoff priority because the debt was not mutual and due when the action commenced.).

[41] Respondents' Statement of Defense ¶ 25.

[42] *See* Claimants' Reply to Statement of Defense at ¶ 24; CM ¶ 93.

[43] RM ¶ 44.

10

Dated:  New York, New York
         October 15, 2012

                                      Respectfully submitted,

                                      */s/ David W. Rivkin*
                                      David W. Rivkin
                                      DEBEVOISE & PLIMPTON LLP
                                      919 Third Avenue
                                      New York, New York  10022

                                      *Counsel to Claimants*